EMILIO M. GARZA, Circuit Judge:
Elizaphan Ntakirutimana appeals the district court’s denial of his habeas corpus petition that challenged the district court’s grant of a second request for surrender. He alleges that the district court erred because (1) the Constitution of the United States requires an Article II treaty for the surrender of a person to the International Criminal Tribunal for Rwanda (“ICTR” or “Tribunal”),[1] (2) the request for surrender does not establish probable cause, (3) the United Nations (“U.N.”) Charter does not authorize the Security Council to establish the ICTR, and (4) the ICTR is not capable of protecting fundamental rights guaranteed by the United States Constitution and international law. We affirm.
I
Rwanda has been the source of ongoing ethnic conflict between members of the majority Hutu and minority Tutsi tribes. In April 1994, President Juvenal Habyari-mana of Rwanda; a Hutu, was killed when his aircraft crashed due to an artillery attack. The crash triggered a wave of violence by the Hutus against the Tutsis, which resulted in the deaths of between 600,000 and one-million persons. Tutsi rebels triumphed over the Hutus, and the Tutsi-dominated government then requested the U.N. to create an international war crimes tribunal. An investigation by the U.N. established that the mass exterminations of the Tutsis — motivated by ethnic hatred — had been planned for months. The Security Council adopted Resolution *422 955, which created the ICTR to prosecute and to punish the individuals responsible for the violations in Rwanda and its neighboring states between January 1 and December 31, 1994. The Resolution directed that “all States shall take any measures necessary under their domestic law to implement the provisions of the present resolution and the Statute [of the ICTR].”[2] S.C.Res. 955, U.N.SCOR, 49th Sess., 3453d mtg. at 1-2 (1994), reprinted, in 33 I.L.M. 1598,1601 (1994).
In 1995, the President of the United States entered into an executive agreement with the ICTR, entitled the Agreement on Surrender of Persons Between the Government of the United States and the International Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States (“Agreement”). The Agreement provided that the United States “agrees to surrender to the Tribunal ... persons ... found in its territory whom the Tribunal has charged with or found guilty of a violation or violations within the competence of the Tribunal.” Agreement, art. 1, cl. 1, Jan. 24, 1995, U.S.-Int’l Trib. Rwanda, 1996 WL 165484, at *1 (Treaty). In 1996, Congress enacted Public Law 104-106 to implement the Agreement. See National Defense Authorization Act, Pub.L. 104-106, • § 1342, 110 Stat. 486 (1996). Section 1342(a)(1) of this legislation provides that the federal extradition statutes (18 U.S.C. §§ 3181 et seq.) shall apply to the surrender of persons to the ICTR. Among the statutory provisions made applicable is 18 U.S.C. § 3184. This section authorizes a judicial officer to hold a hearing to consider a request for surrender. If the judicial officer finds the evidence sufficient to sustain the charges under the treaty or convention, then the officer certifies to the Secretary of State that the individual may be surrendered. See also 18 U.S.C. § 3186 (conferring final authority on the Secretary of State to order a fugitive’s surrender where a judicial officer has ruled that the requirements for extradition have been met).
In June and September 1996, the ICTR returned two indictments against Pastor Ntakirutimana, charging him with the crimes of genocide, complicity in genocide, conspiracy to commit genocide, crimes against humanity, and serious violations of Article 3 common to the Geneva Conventions and of Additional Protocol II thereto.[3] At the time of the charges, Ntakiruti-mana, a Hutu, served as President of the Seventh Day Adventist Church for all of Rwanda. He was based in a church complex (the “Complex”) in Mugonero, Gishyi-ta Commune, Kibuye Prefecture, Rwanda,[4] and was well known in the Complex and the community. The first indictment alleges that, following the beginning of the wave of violence in 1994, Ntakirutimana and other individuals prepared and executed a plan by which they encouraged large numbers of the local Tutsis population to seek refuge in the Complex. They separated the Hutus from the Tutsis and encouraged the Hutus to leave. Ntakiruti-mana then raised an armed mob of Hutus, led them to the Complex, and directed the slaughter of the Tutsis who had sought shelter there. A Tribunal Judge con *423 firmed the indictment and issued a warrant for Ntakirutimana’s arrest.
The second indictment charges Ntakiru-timana with conduct that occurred after the massacre at the Complex. The survivors of the attack fled to the Bisesero area of Kibuye Prefecture, Rwanda. The indictment alleges that Ntakirutimana drove armed Hutu soldiers into the Bisesero region, hunted for hiding Tutsis, and ordered the soldiers to kill them. A Tribunal Judge confirmed the second indictment and issued another warrant for Ntakiruti-mana’s arrest.
Ntakirutimana has legally resided in Laredo, Texas since he left Rwanda in 1994. The ICTR requested that the United States extradite Ntakirutimana to the ICTR pursuant to the Agreement. In September 1996, the Government filed a request for Ntakirutimana’s surrender to the ICTR in the Southern District of Texas. A Magistrate Judge, serving as the judicial officer, denied the Government’s request for surrender. He held that Public Law 104-106 is unconstitutional because, based on historical practice, extradition requires a treaty. See In re Surrender of Ntakirutimana, 988 F.Supp. 1038, 1042 (S.D.Tex.1997). He held alternatively that the request for surrender, and the supporting documents, did not provide probable cause to support the charges. See id. at 1044.
To address the evidentiary issues raised by the Magistrate Judge, the Government added two declarations, and filed another request for surrender in the same court.[5] The district court certified the surrender to the ICTR,[6] The court held that the Agreement and Public Law 104-106 provide a constitutional basis for the extradition of Ntakirutimana. Among other reasons, the court found that the Constitution sets forth no specific requirements for extradition, that the Supreme Court has indicated its approval of extraditions made in the absence of a treaty, and that there is precedent wherein fugitives were extradited pursuant to statutes that “filled the gap” left by a treaty provision. See In re Surrender of Ntakirutimana, No. Civ. A. L-98-43, 1998 WL 655708, at *9, 17 (S.D.Tex. Aug.6, 1998). The court also held that the evidence sufficed to establish probable cause for the charges against Ntakirutimana. See id. at *30. Ntakiruti-mana filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241. The district court denied the petition, and Ntaki-rutimana has timely appealed.[7]
II
The scope of habeas corpus review of the findings of a judicial officer that conducted an extradition hearing is extremely limited. See Garcia-Guillern v. United States, 450 F.2d 1189, 1191 (5th Cir.1971). We inquire only into (1) whether the committing court[8] had jurisdiction, (2) whether the offense charged is within the treaty, and (3) whether the evidence shows a reasonable ground to believe the accused guilty. See Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); Garcia-Guillern, 450 *424 F.2d at 1191. A writ of habeas corpus in a case of extradition is not- a means for rehearing the findings of the committing court. See Fernandez, 268 U.S. at 312, 45 S.Ct. at 542; Oteiza v. Jacobus, 136 U.S. 330, 334, 10 S.Ct. 1031, 1032, 34 L.Ed. 464 (1890); Escobedo v. United States, 623 F.2d 1098, 1101 (5th Cir.1980).
Ill
Ntakirutimana alleges that Article II of the Constitution of the United States requires that an extradition occur pursuant to a treaty. It is unconstitutional, he claims, to extradite him to the ICTR pursuant to a statute in the absence of a treaty. Accordingly, he claims it is unconstitutional to extradite him on the basis of the Agreement and Pub.Law 104-106 (the “Congressional-Executive Agreement”).[9] The district court concluded that it is constitutional to surrender Ntakirutimana in the absence of an “extradition treaty,” because a statute authorized extradition. We review this legal issue de novo.[10] See United States v. Luna, 165 F.3d 316, 319 (5th Cir.1999), cert. denied, — U.S. —, 119 S.Ct. 1783, 143 L.Ed.2d 811 (1999) (reviewing constitutionality of extradition statute de novo).
To determine whether a treaty is required to extradite Ntakirutimana, we turn to the text of the Constitution. Ntakiruti-mana contends that Article II, Section 2, Clause 2 of the Constitution requires a treaty to extradite. This Clause, which enumerates the President’s foreign relations power, provides in part that “[the President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls .... ” U.S. Const, art. II, § 2, cl. 2. This provision does not refer either to extradition or to the necessity of a treaty to extradite. The Supreme Court has explained, however, that “[t]he power to surrender is clearly included within the treaty-making power and the corresponding power of appointing and receiving ambassadors and other public ministers.” Terlinden v. Ames, 184 U.S. 270, 289, 22 S.Ct. 484, 492, 46 L.Ed. 534 (1902) (citation omitted).
Yet, the Court has found that the Executive’s power to surrender fugitives is not unlimited. In Valentine v. United States, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936), the Supreme Court considered whether an exception clause[11] in the United States’s extradition treaty with France implicitly granted to the Executive the discretionary power to surrender citizens. The Court first stated that the power to provide for extradition is a national power that “is not confided to the Executive in the absence of treaty or legislative provision.” Id. at 8, 57 S.Ct. at 102. The Court explained:
[The power to extradite] rests upon the fundamental consideration that the Constitution creates no executive prerogative to dispose of the liberty of the individual. Proceedings against him must *425 be authorized by law. There is no executive discretion to surrender him to a foreign government, unless that discretion is granted by law. It necessarily follows that as the legal authority does not exist save as it is given by act of Congress or by the terms of a treaty, it is not enough that the statute or treaty does not deny the power to surrender. It must be found that statute or treaty confers the power.
Id. at 9, 57 S.Ct. at 102.
The Court then considered whether any statute authorized the Executive’s discretion to extradite. The Court commented that:
Whatever may be the power of the Congress to provide for extradition independent of treaty, that power has not been exercised save in relation to a foreign country or territory “occupied by or under the control of the United States.” Aside from that limited provision, the Act of Congress relating to extradition simply defines the procedure to carry out an existing extradition treaty or convention.
Id. at 9, 57 S.Ct. at 102-03 (citations omitted). The Court concluded that no statutory basis conferred the power on the Executive to surrender a citizen to the foreign government. See id. at 10, 57 S.Ct. at 103. The Court subsequently addressed whether the treaty conferred the power to surrender, and found that it did not. See id. at 18, 57 S.Ct. at 106. The Court concluded that, “we are constrained to hold that [the President’s] power, in the absence of statute conferring an independent power, must be found in the terms of the treaty and that, as the treaty with France fails to grant the necessary authority, the President is without the power to surrender the respondents.” Id. The Court added that the remedy for this lack of power “lies with the Congress, or with the treaty-making power wherever the parties are willing to provide for the surrender of citizens.” Id.
Valentine indicates that a court should look to whether a treaty or statute grants executive discretion to extradite. Hence, Valentine supports the constitutionality of using the Congressional-Executive Agreement to extradite Ntakirutimana. Ntakirutimana attempts to distinguish Valentine on the ground that the case dealt with a treaty between France and the United States. Yet, Valentine indicates that a statute suffices to confer authority on the President to surrender a fugitive. See id. Ntakirutimana suggests also that Valentine expressly challenged the power of Congress, independent of treaty, to provide for extradition. Valentine, however, did not place a limit on Congress’s power to provide for extradition. See id. at 9, 57 S.Ct. at 102 (“Whatever may be the power of the Congress to provide for extradition independent of treaty ... ”). Thus, although some authorization by law is necessary for the Executive to extradite, neither the Constitution’s text nor Valentine require that the authorization come in the form of a treaty.
Notwithstanding the Constitution’s text or Valentine, Ntakirutimana argues that the intent of the drafters of the Constitution supports his interpretation. He alleges that the delegates to the Constitutional Convention intentionally placed the Treaty power exclusively in the President and the Senate. The delegates designed this arrangement because they wanted a single executive agent to negotiate agreements with foreign powers, and they wanted the senior House of Congress — the Senate — to review the agreements to serve as a check on the executive branch. Ntakirutimana also claims that the rejection of alternative proposals suggests that the framers believed that a treaty is the only means by which the United States can enter into a binding agreement with a foreign nation.[12]
*426 We are unpersuaded by Ntakirutimana’s extended discussion of the Constitution’s history. Ntakirutimana does not cite to any provision in the Constitution or any aspect of its history that requires a treaty to extradite. Ntakirutimana’s argument, which is not specific to extradition, is premised on the assumption that a treaty is required for an international agreement. To the contrary, “[t]he Constitution, while expounding procedural requirements for treaties alone, apparently contemplates alternate modes of international agreements.” LauRenoe H. Tribe, Amerioan Constitutional Law § 4-5, at 228-29 (2d ed.1988) (explaining that Article 1, § 10 of the Constitution refers to other international devices that may be used by the federal government). “The Supreme Court has recognized that of necessity the President may enter into certain binding agreements with foreign nations not strictly congruent with the formalities required by the Constitution’s Treaty Clause.” United States v. Walczak, 783 F.2d 852, 855 (9th Cir.1986) (citations omitted) (executive agreement). More specifically, the Supreme Court has repeatedly stated that a treaty or statute may confer the power to extradite. See, e.g., Valentine, 299 U.S. at 18, 57 S.Ct. at 106; Grin v. Shine, 187 U.S. 181, 191, 23 S.Ct. 98, 102, 47 L.Ed. 130 (1902) (“Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect, and to declare that foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient.” (citation omitted)); Terlinden, 184 U.S. at 289, 22 S.Ct. at 492 (“In the United States, the general opinion and practice have been that extradition should be declined in the absence of a conventional or legislative provision.” (citation omitted)).
Ntakirutimana next argues that historical practice establishes that a treaty is required to extradite. According to Ntaki-rutimana, the United States has never surrendered a person except pursuant to an Article II treaty, and the only involuntary transfers without an extradition treaty have been to “a foreign country or territory ‘occupied by or under the control of the United States.’ ” Valentine, 299 U.S. at 9, 57 S.Ct. at 102. This argument fails for numerous reasons. First, Valentine did not suggest that this “historical practice” limited Congress’s power. See id. at 9, 57 S.Ct. at 102-03. Second, the Supreme Court’s statements that a statute may confer the power to extradite also reflect a historical understanding of the Constitution. See, e.g., id. at 18, 57 S.Ct. at 106; Grin, 187 U.S. at 191, 23 S.Ct. at 102; Terlinden, 184 U.S. at 289, 22 S.Ct. at 492. Even if Congress has rarely exercised the power to extradite by statute, a historical understanding exists nonetheless that it may do so. Third, in some instances in which a fugitive would not have been extraditable under a treaty, a fugitive has been extradited pursuant to a statute that “filled the gap” in the treaty. See, e.g., Hilario v. United States, 854 F.Supp. 165 (E.D.N.Y.1994) (upholding extradition pursuant to a post -Valentine statute that granted executive discretion to extradite). Thus, we are unconvinced that the President’s practice of usually submitting a negotiated treaty to the Senate reflects a historical understanding that a treaty is required to extradite.
We are unpersuaded by Ntakirutima-na’s other arguments. First, he asserts that the failure to require a treaty violates the Constitution’s separation of powers. He contends that if a treaty is not required, then “the President alone could make dangerous agreements with foreign governments” or “Congress could legislate foreign affairs.” This argument is not relevant to an Executive-Congressional agreement, which involves neither the President acting unilaterally nor Congress negotiating with foreign countries. Second, Ntakirutimana argues that “statutes cannot usurp the Treaty making power of Article II.” The Supreme Court, however, has held that statutes can usurp a treaty. This is confirmed by the “last in time” rule that, if a statute and treaty are *427 inconsistent, then the last in time will prevail. See, e.g., Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888) (“if the two are inconsistent, the one last in date will control the other”). This rule explicitly contemplates that a statute and a treaty may at times cover the same subject matter. Third, Ntakirutimana contends that not requiring a treaty reads the treaty-making power out of the Constitution. Yet, the treaty-making power remains unaffected, because the President may still elect to submit a negotiated treaty to the Senate, instead of submitting legislation to Congress. See The Restatement (Third) of Foreign Relations Law, § 303 cmt. e (1986) (“Which procedure should be used is a political judgment, made in the first instance by the President, subject to the possibility that the Senate might refuse to consider a joint resolution of Congress to approve an agreement, insisting that the President submit the agreement as a treaty”). Thus, we conclude that it is not unconstitutional to surrender Ntakirutimana to the ICTR pursuant to the Executive-Congressional Agreement.
rv
Ntakirutimana contends next that the district court erred in dismissing his habeas petition because the request for surrender fails to establish probable cause. The Agreement with the ICTR requires that the Tribunal present “information sufficient to establish that there is a reasonable basis to believe that the person sought has committed the violation or violations for which surrender is requested.” Agreement, art. 2, cl. 3, 1996 WL 165484, at *1. This requirement is designed to meet our constitutional “probable cause” standard in reviewing the sufficiency of the evidence in extradition proceedings. In reviewing a request for surrender, the committing court must determine whether probable cause exists to sustain the charges against the accused. See Collins v. Loisel, 259 U.S. 309, 314-15, 42 S.Ct. 469, 471, 66 L.Ed. 956 (1922); Escobedo, 623 F.2d at 1102. Our function on habeas review “is to determine whether there is any competent evidence tending to show probable cause. The weight and sufficiency of that evidence is for the determination of the committing court.” Escobedo, 623 F.2d at 1102 (quotations and citations omitted); cf. Quinn v. Robinson, 783 F.2d 776, 791 (9th Cir.1986) (“Because the magistrate’s probable cause finding is thus not a finding of fact ‘in the sense that the court has weighed the evidence and resolved disputed factual issues,’ it must be upheld if there is any competent evidence in the record to support it.” (citations omitted)).
The evidence at the extradition hearing consisted of several documents, all of which were admissible.[13] Along with the first request for surrender, the Government included a declaration from Arjen Mostert, who served for six months as a Tribunal investigator. Mostert obtained the declarations of twelve witnesses, labeled A-L to protect their identities, who survived the Mugonero and Bisesero massacres. Mostert declared that the witnesses were ordinary citizens and did not receive consideration for their testimony. The witnesses, all of whom were familiar with Ntakirutimana, described seeing him at the massacre or leading the soldiers in search of Tutsis at Bisesero.[14] The wit *428 nesses’ statements corroborated one another, and many of the witnesses positively identified a photograph of Ntakirutimana. When the Magistrate Judge denied the first request for surrender, he found Mos-tert’s affidavit alone insufficient to provide probable cause to support the charges.
In response to the Magistrate Judge’s concerns, the Government added a supplemental declaration of Mostert with its second request for surrender.[15] The second request also included the declaration of Pierre-Richard Prosper, the assistant prosecutor for the ICTR. Prosper further clarified the information in Mostert’s initial declaration.[16] The district court stated that the supplemental declarations satisfactorily responded to the Magistrate Judge’s earlier objections. The district court concluded that probable cause existed to sustain the charges against Ntakiru-timana.
Ntakirutimana argues that the district court erred. He contends that the Tribunal has not presented evidence sufficient to show probable cause, because the allegations in Mostert’s declarations “lack probative force and are unreliable.”[17] Ntakirutimana primarily raises credibility challenges to the evidence against him.[18] *429 Yet, the issue of credibility “is a matter committed to the magistrate and is not reviewable on habeas corpus.” Escobedo, 623 F.2d at 1102 n. 10 (citations omitted); see also Quinn, 783 F.2d at 815 (“The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate.” (citation omitted)); cf. Collins, 259 U.S. at 316, 42 S.Ct. at 472 (explaining that a petitioner can introduce evidence on probable cause, but cannot introduce evidence in defense, because otherwise the extradition proceeding will become a full hearing and trial of the case); Eain v. Wilkes, 641 F.2d 504, 511 (7th Cir.1981) (“An accused in an extradition hearing has no right ... to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof’ (citation omitted)); Shapiro v. Ferrandina, 478 F.2d 894, 905 (2d Cir.1973) (stating that credibility conflict should await trial).
Ntakirutimana asserts that the credibility of the witnesses was not known to the investigators or established by the Tribunal. According to Ntakirutimana, if the witnesses had ties to the Rwandan government, then the witnesses would have been under pressure to incriminate persons about whom they were questioned. The district court noted, however, that Ntaki-rutimana provided no specific reason to doubt the credibility of the witnesses. The court stated that the witnesses’ statements “enjoy several indicia of reliability,” such as the similarity of the witnesses’ statements. The court resolved the credibility challenge in the Government’s favor. We defer to this conclusion regarding the credibility of the witnesses.[19] See Escobedo, 623 F.2d at 1102 n. 10.
Ntakirutimana raises the issue of Mos-tert’s credibility, because the signature page of Mostert’s first declaration was typed with a different computer than the first twenty-four pages. Ntakirutimana asserts that Mostert could have signed the signature page, and that, after Mostert’s employment ended, the page could have been attached to any text. Thus, Ntakiru-timana argues, all of Mostert’s declarations cannot be taken at face value. The district court rejected this credibility challenge, finding that Mostert’s supplemental declaration, in which he avowed that the first declaration was accurate and complete, answered this allegation. As explained previously, we will not revisit this credibility finding. See Escobedo, 623 F.2d at 1102 n. 10.
Ntakirutimana also challenges the probable cause determination on the ground that the translators were unreliable. The investigators conducted most of their interviews through translators of English and French, the languages of the Tribunal. With the exception of one French-speaking witness, the witnesses spoke Kinyarwanda, Rwanda’s native language. Ntakirutimana argues that the translators were not certified or screened for competence or bias, that there was an enormous potential for distortion by the unscreened interpreters, and that there was no way to gauge the accuracy of the translations. The district court declined to address Ntakirutimana’s challenge to the reliability of the translations. The court stated that, as long as the evidence is authenticated in accordance with § 3190,[20] *430 then it would not consider challenges to the reliability of the translation. We agree with the district court that we can presume that the translations are correct. See In re Extradition of David, 395 F.Supp. 803, 806 (E.D.Ill.1975) (“The Court feels that the translations must be presumed to be correct unless David presents some convincing evidence otherwise.”). The extradition court need not independently inquire into the accuracy of the translations submitted with a formal extradition request, because “[s]uch a requirement would place an unbearable burden upon extradition courts and seriously impair the extradition process.” Tang Yee-Chun v. Immundi, 686 F.Supp. 1004, 1009 (S.D.N.Y.1987). Hence, we decline to address Ntakirutimana’s speculations regarding the reliability of the translations.
In short, the district court resolved the credibility challenges adversely to Ntaki-rutimana, and we will not review those issues. We hold that, based on Mostert’s and Prosper’s declarations, there is competent evidence in the record to support the district court’s finding that the evidence established probable cause to believe that Ntakirutimana committed the crimes charged.
V
Finally, we turn to Ntakirutimana’s remaining arguments. Ntakirutimana argues that the U.N. Charter does not authorize the Security Council to establish the ICTR, and that the only method for the U.N. to create an international criminal tribunal is by a multinational treaty. This issue is beyond the scope of habeas review. See Garcia-Guillern, 450 F.2d at 1191 (outlining three issues for habeas review); cf. Terlinden, 184 U.S. at 289, 22 S.Ct. at 491-92 (stating that it would be impossible for the Executive Department to conduct foreign relations if every court in the country was authorized to inquire and decide whether the person who ratified the treaty on behalf of a foreign nation had the power, by its Constitution and laws, to make the engagements into which he entered). Ntakirutimana contends additionally that the ICTR is incapable of protecting his rights under the United States Constitution and international law. He contends, for example, that the ICTR is incapable of protecting his due process rights and that the ICTR denies the right to be represented by the counsel of one’s choice. Due to the limited scope of habeas review, we will not inquire into the procedures that await Ntakiruti-mana. See Garcia-Guillern, 450 F.2d at 1192; Gallina v. Fraser, 278 F.2d 77, 79 (2d Cir.1960) (regarding as significant that the procedures that will occur in the demanding country are not listed within the scope of habeas review); see also In re Extradition of Manzi, 888 F.2d 204, 206 (1st Cir.1989) (explaining the rule of “non-inquiry”). “Such matters, so far as they may be pertinent, are left to the State Department, which ultimately will determine whether the appellant will be surrendered to the [ICTR].” Garcia-Guillern, 450 F.2d at 1192.
VI
For the foregoing reasons, we AFFIRM the order of the district court denying Ntakirutimana’s petition for a writ of ha-beas corpus, and LIFT the stay of extradition.

. The full name of the Tribunal is: International Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States. See National Defense Authorization Act, Pub.L. 104-106, § 1342(c)(2), 110 Stat. 486 (1996).

. The Statute of the ICTR, which is annexed to Resolution 955, and the Rules of Procedure and Evidence of the ICTR guide proceedings before the ICTR.

. Article 2 of the Statute of the ICTR provides that the ICTR has the power to prosecute genocide, including complicity in genocide and conspiracy to commit genocide. Article 3 provides the ICTR with the power to prosecute crimes against humanity. Article 4 provides the ICTR with the power to prosecute serious violations of Article 3 common to the Geneva Conventions and of Additional Protocol II thereto. See S.C.Res. 955, at 3-5.

.A “prefecture” is like a state, and a "commune” is like a county within a state.

. The government did not appeal the request, because extradition decisions are not appeal-able under 28 U.S.C. § 1291. See In re Extradition of Howard, 996 F.2d 1320, 1325 (1st Cir.1993) (explaining that the extradition judge is not acting in his capacity as an Article III judge, and thus the decision is not a decision of the "district court”). The government’s remedy is to file another request. See, e.g., id. at 1325; Gusikoff v. United States, 620 F.2d 459, 461 (5th Cir.1980).

. The district court judge served as the judicial officer for the extradition proceeding. We recognize that the order issued by the judge is not an order of the "district court,” yet we refer to it as such for simplicity.

. We granted a stay of extradition pending appeal.

. The judicial officer, whether state or federal, who is authorized to hold an extradition hearing pursuant to the terms of 18 U.S.C. § 3184 is often referred to as a "magistrate” or as the “committing court.” See Sayne v. Shipley, 418 F.2d 679, 685 n. 15 (5th Cir.1969).

. See The Restatement (Third) of Foreign Relations Law, § 303 cmt. e (1986) (describing Congressional-Executive agreements).

. We may review this issue because Ntalriru-timana's challenge to the constitutionality of the statute, pursuant to which the district court issued the certification of extraditability, represents a challenge to the committing court's jurisdiction. See, e.g., Manrique Carreno v. Johnson, 899 F.Supp. 624, 629 (S.D.Fla.1995) (construing constitutionality argument as a challenge to the committing court’s jurisdiction).

. The exception clause provided, “Neither of the contracting Parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention." Valentine, 299 U.S. at 7, 57 S.Ct. at 102 (citations omitted). Historically, “[w]here treaties have provided for the extradition of persons without exception, the United States has always construed its obligation as embracing its citizens.’’ Id. (citation omitted). Exception clauses excuse a government from surrendering its own citizens.

. For example, Madison proposed making two types of treaties: one made by the President with the concurrence of the Senate, and the other requiring the concurrence of the whole legislature.

. There is no dispute that all three declarations have been properly authenticated by either the Ambassador of the United States at Kigali, Rwanda (where the office of the Prosecutor for the Tribunal is located), or the Ambassador of the United States to the Netherlands (where the Tribunal’s Prosecutor is based). The authentication renders the documents admissible under 18 U.S.C. § 3190. See 18 U.S.C. § 3190 (authentication requirement).

. The first indictment is based on evidence from nine witnesses, four of whom knew Nta-kirutimana personally. Witnesses B, C, H, and I saw Ntakirutimana among the armed attackers at the Complex massacre. Witness H heard Ntakirutimana say "kill them all” to an attacker. Witness I heard Ntakirutimana *428 tell Tutsis at the Complex, "you are all condemned to die."
The second indictment, which involves the events following the Complex massacre, is based on evidence from five witnesses. Witness C saw Ntakirutimana arrive at a Complex where Tutsis were hiding, and he heard Ntakirutimana tell soldiers to "take off the roof from this church so it cannot be used anymore as a hiding place for these dogs.” Witness H corroborated Witness C's recount. Witness I saw Ntakirutimana shoot at Tutsis.
The Appendix to the district court's opinion also provides summaries of the witnesses' statements. See Ntakirutimana, 1998 WL 655708, at *33-37.

. Mostert’s supplemental declaration explained that he used different interpreters for many of the interviews, and that he used the interpreters for a large number of other interviews. He stated that the interpreters appeared to interpret correctly based on several criteria. He also explained that the photograph identification was confirmatory in nature. Mostert showed the photograph of Nta-kirutimana to many of the witnesses after they stated that they knew him and had provided a physical description that Mostert believed to be correct.

. Prosper provided the following clarifying information. First, many of the witnesses were interviewed several times, and the interviews initially were general and later became more focused. Second, the Office of the Prosecutor for the ICTR has a policy to read back the statement to the witness for accuracy, and all of the witnesses upon whom Mostert relied were subjected to this process. The witnesses all signed their statement and a Witness Acknowledgment Form affirming that the statement is true to the best of their recollection. Third, all witnesses spoke Kinyarwanda, except for Witness B who was interviewed in French by a French-speaking investigator. Prosper stated that the texts of the written statements were proficiently written, and that he personally knew all of the interpreters who performed the final interviews. For each interview, the interpreter signed a certification that he had translated the interview. Fourth, Prosper attested that, based on the information before him, he believed the witnesses to be reliable. He stated that the witnesses are ordinary citizen-victim-eyewitnesses who were speaking of their own personal experiences. They were not informants, their statements corroborated one another, and he had discovered no evidence that a witness had a reason to lie. Fifth, all the witnesses knew or were familiar with Ntakirutimana, who was a chief pastor in the Complex. Ten of the witnesses claimed Seventh Day Adventist as their religion. All of the witnesses but one were Tutsi.

. Ntakirutimana argues initially that "it is rare for substantive criminal allegations in support of an extradition request to be presented solely in an investigator's affidavit.” We deem this objection waived, because Nta-kirutimana did not raise the objection at his extradition hearing. See Lo Duca v. United States, 93 F.3d 1100, 1 111 (2d Cir.1996) (finding that extraditee waived non-jurisdictional objection by failing to raise the objection at the extradition hearing).

. Apart from his credibility challenges, Nta-kirutimana briefly attempts to explain his actions. He asserts that, because churches were customary places of sanctuary, there would be nothing sinister for anyone to encourage Tutsis to congregate in the Complex. Yet, this explanation fails to explain most of *429 the allegations against him. Further, Ntaki-rutimana conceded at the extradition hearing that, without respect to the reliability of the evidence (which has been resolved adversely to Ntakirutimana), the substance of what is reported in the affidavits constitutes probable cause.

. Ntakirutimana contends that eyewitness accounts of traumatic events are inherently unreliable, and that the witnesses’ statements are undermined by “Rwanda’s oral tradition in which Rwandans adopt and confuse what they have seen with what they have been told by others and consider it their personal experience.” Ntakirutimana waived this argument by failing to raise it below. See Lo Duca, 93 F.3d at 1111.

. See supra note 13.