**In the Matter of THE EXTRADITION OF JAMES COE, aka Hui Lok-kwan, aka Hsu Lo-chun**

**No. CV 03–596–DDP (PLA).**

United States District Court, C.D. California, Western Division.

April 2, 2003.

Judith A. Heinz, Assist. U.S. Atty., Los Angeles, CA, for plaintiffs.

Dana Cephas, Deputy Fed. Public Defender, Los Angeles, CA, for James Coe.

**ORDER RE: JURISDICTION OF COURT AND VALIDITY OF TREATY IN EXTRADITION MATTER**

ABRAMS, United States Magistrate Judge.

## I. PROCEDURAL SUMMARY

James Coe, aka "Hui Lok-kwan," aka "Hsu Lo-chun," was arrested November 19, 2002, in the Central District of California on an extradition arrest warrant issued pursuant to the request of the government of the Hong Kong Special Administrative Region ("HKSAR") of the People's Republic of China ("PRC").[1] A Hong Kong Magistrate issued an arrest warrant for Coe on 15 counts of false accounting, one count of criminal liability for misstatement in prospectus, and one count of conspiracy to defraud, all resulting from criminal activities that allegedly took place in Hong Kong in 1982 and 1983. The request for extradition was made pursuant to the United States' "Agreement with Hong Kong for the Surrender of Fugitive Offenders" ("Agreement"). Coe initially appeared before United States Magistrate Judge Ralph Zarefsky on November 19, 2002. Following a hearing on December 5, 2002, Magistrate Judge Zarefsky denied

---

1. Because the history of the relationship between the HKSAR and the PRC is well known to both parties and was extensively recounted by the Second Circuit in *Cheung v. United States*, 213 F.3d 82, 84–86 (2nd Cir.2000), it will not be repeated here.

Coe's Motion for Bail. Coe filed an Application for Review of an Order Denying Bail, which came for hearing before District Judge Florence–Marie Cooper on December 13, 2002. District Judge Cooper found that special circumstances existed and granted Coe's request for bail.

HKSAR presented its formal extradition papers and supporting documents ("Formal Papers") requesting Coe's surrender to the Consulate General of the United States of America in Hong Kong on January 15, 2003. The Formal Papers, which include a copy of the Agreement as Exhibit A, were filed with this Court on January 24, 2003.

Following an initial status conference on February 5, 2003, the Court ordered the parties to file briefs addressing the legal issues involved in the case. On February 28, 2003, the United States filed a "Request for Certain Findings Re Extradition" ("Request"), requesting that the Court issue initial rulings on the following five issues relating to the jurisdiction of the Court and the scope and enforceability of the Agreement:

1.  The Court has subject matter jurisdiction in these proceedings;

2.  The Court has personal jurisdiction over James Coe, aka "Hui Lok-kwan," aka "Hsu Lo-chun";

3.  The Agreement is valid and enforceable, and provides the legal authority for the extradition of Coe to the HKSAR;

4.  Coe is sought for offenses covered by the Agreement; and

5.  There is probable cause to believe that the person before the Court is the person named in the Hong Kong arrest warrants.

(*See* Request at 2). The United States also requested that the Court reserve for future determination whether there is probable cause to believe that Coe committed the offenses for which extradition is sought. (*Id.*). In addition, the Government filed a "Position and Request for Ruling on Validity of Treaty" ("Position").

Coe filed his "Response to Government's (1) Request for Certain Findings and (2) Position and Request for Ruling on Validity of Treaty" ("Response") on March 21, 2003. Coe concedes three of the issues raised by the United States and contests only the issues of whether the Court has subject matter jurisdiction in these proceedings and whether the Agreement is valid and enforceable. (Response at 1). During a second status conference, during which each party presented oral arguments, Coe confirmed that he is contesting only two of the five issues raised by the United States, *i.e.*, subject matter jurisdiction and whether the Agreement is valid.

## II.  THE EXTRADITION PROCESS

■ The federal extradition statute provides, in relevant part:

Whenever there is a treaty or convention for extradition between the United States and any foreign government . . . , any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States . . . , may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention . . . , issue his warrant for the apprehension of the person so charged

. . .

18 U.S.C. § 3184. Judicial review of extradition matters is limited to: "(1) whether the extradition judge had jurisdiction to conduct the proceeding; (2) whether the extradition court had jurisdiction over the individual sought; (3) whether the extradition treaty was in force; (4) whether the crime fell within the treaty's terms; (5)

whether there was probable cause that the individual sought committed the crime; and (6) whether the crime was within the political offense exception." *Cornejo–Barreto v. Seifert,* 218 F.3d 1004, 1009–10 (9th Cir.2000) (internal citations omitted). But a "statute or extradition treaty is a prerequisite to extradition." *Id.,* at 1009. Consequently, in order to resolve whether there is subject matter jurisdiction in this matter, the Court must determine whether the United States and the HKSAR have a valid extradition treaty. *See, e.g., Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 681 (9th Cir.1983) ("The first issue in this case is whether Iceland and the United States have a valid extradition treaty."), *superseded by statute on other grounds* (*see Cornejo–Barreto,* 218 F.3d at 1009, n. 5).

## III. THE COURT IS BOUND BY THE LAW OF THE CASE DOCTRINE TO FIND THAT THE AGREEMENT IS VALID AND ENFORCEABLE.

Coe, in contesting that the Court has subject matter jurisdiction in these proceedings, has raised only one issue—the validity and enforceability of the Agreement. This issue, however, already has been decided in this case by both Magistrate Judge Zarefsky and District Judge Cooper.

Although Coe argues that both earlier rulings concerned the existence of special circumstances that would justify bail and only touched on the validity of the Agreement in dicta, the record clearly demonstrates otherwise. First, Magistrate Judge Zarefsky continued a hearing on Coe's Motion for Bail to allow the parties to brief the issue of the validity of the extradition treaty. Both parties submitted briefs (*see* "James Coe's Continued Motion for an Order Granting Bail" at 5–7; "James Coe's Reply to Government's Position Regarding Legality of Extradition

Agreement with Hong Kong and Position on Bail" at 1–6; "Government's Position Regarding Legality of Extradition Agreement with Hong Kong; Position on Bail" at 4–12), and presented oral argument on the issue (*see* Position, Ex. A at 19–20, 21–23). Coe's request for bail was premised on his argument that "[b]ail is warranted here because the extradition agreement underlying the current detention is unenforceable as a matter of law." ("James Coe's Continued Motion for an Order Granting Bail" at 1, 5–7). Coe also listed several unrelated matters that he argued constituted special circumstances and concluded with the assertion that "the legal questions arising from the treaty's enforceability are yet another circumstance that weighs in favor of release." (*Id.* at 12).

At the hearing, and following arguments from both parties, Magistrate Judge Zarefsky ruled that he "did not agree that the status of the treaty constitutes a special circumstance justifying bail." (*See* Position, Ex. A at 24). Magistrate Judge Zarefsky then stated that the "Ninth Circuit has not considered the status of the treaty, but the Second Circuit has rejected every argument that has been made here that the treaty is unenforceable." (*Id.*). Magistrate Judge Zarefsky held that, "for the reasons stated by the Second Circuit, the Court agrees that the agreement for extradition is enforceable under the extradition statute." (*Id.* at 24–5). After considering the other special circumstances raised by Coe and finding none applicable, Magistrate Judge Zarefsky denied bail. (*Id.* at 25).

Coe then filed an Application for Review of the order denying bail in which he again argued that the "extradition agreement underlying the current detention is unenforceable as a matter of law" and, therefore, there was no basis to detain him.

(*See* "James Coe's Memorandum of Points and Authorities in Support of Application for Review of an Order Denying Bail" at 1–2). Coe expanded upon the arguments presented to Magistrate Judge Zarefsky that the treaty was invalid (*see id.* at 6–11), argued that several other factors constituted special circumstances, and concluded by arguing that he "should be granted bail because the underlying extradition agreement is unenforceable as currently established" (*see id.* at 18).

District Judge Cooper held a hearing on Coe's Application for Review. The District Judge stated that she had "read all of the documents that were filed before the Magistrate Judge in connection with the issue of the validity of the extradition agreement with Hong Kong and also on the issue of special circumstances ... and also the documents that were filed with this court on those same issues." (*See* Position, Ex. B at 30–31). The District Judge stated that she found the analysis in *Cheung v. United States*, 213 F.3d 82, 89 (2nd Cir.2000), to be persuasive and believed that the issue of the validity of the treaty had been properly resolved by that court. Further, she held that "I believe that the President and the Senate had the authority to enter into an enforceable extradition agreement or treaty with Hong Kong based on the reasoning in the *Cheung* case." (*Id.*, Ex. B at 31). District Judge Cooper went on to rule on the "alternative request for bail," finding that there were "a number of special circumstances that would grant an exception in this case to the detention required in an extradition case." (*Id.*). Coe was released on bond with several conditions. (*Id.* at 33–4).

Thus, it is clear that the issue of the validity of the Agreement was not dicta in the earlier two decisions. Because Coe presented the issue in his Motion for an Order Granting Bail and his Application

for Review not only as a special circumstance justifying bail, but also as a matter going to the legality of his detention, neither court could rule on Coe's motion for bail without reaching his contention that there was no valid treaty on which to detain him. Consequently, this Court is bound by the law of the case to find that the Agreement is valid and enforceable. *See, e.g., Mendenhall v. NTSB*, 213 F.3d 464, 469 (9th Cir.2000) (as amended) (under the law of the case doctrine "a court is generally precluded from reconsidering an issue that has already been decided by the same court or a higher court in the same case"). Coe's contention that his prior briefing was done quickly and that his identification of additional legal authority should be considered to be a "changed circumstance" that would permit the Court to depart from the law of the case is not persuasive in light of the extensive analysis of the issue conducted in connection with the two earlier hearings. Further, as discussed below, the Court concurs with the earlier decisions and does not find that they were clearly erroneous. *See Arizona v. California*, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) ("Under law of the case doctrine, as now most commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice."). However, even if this Court were not bound by earlier decisions finding the Agreement valid and enforceable, Coe's claims would still fail, as set forth in the following sections.

## IV. THE RECOGNITION OF A FOREIGN GOVERNMENT IS A POLITICAL QUESTION ON WHICH THIS COURT MUST DEFER TO THE POLITICAL BRANCHES.

■ Coe argues, in part, that the Agreement is not enforceable because

"Hong Kong may not enter into extradition agreements without the express approval of the PRC" and "the PRC has never authorized officials of the HKSAR to enter into the Extradition Agreement at issue here."[2] (Response at 7–8). Therefore, Coe asserts, the representatives of the HKSAR had no authority to enter into a binding agreement with the United States. (Response at 8).

The authority of a foreign government to enter into any agreement with the United States is a political question on which the Court must defer to the political branches of the government. This Court agrees with the Second Circuit, as it found in *Cheung*, that the political question doctrine prevents the courts from determining the legitimacy of the government of the HKSAR. The Second Circuit further found that there was "no doubt that in enacting the Agreement, both the Executive Branch and the Senate intended to conclude a treaty with the government of HKSAR, rather than with its sovereign, the PRC." *Cheung*, 213 F.3d at 93. As argued by the United States here, it is uncontroverted that the President entered into the extradition agreement with the HKSAR and that he did so with the advice and consent of the Senate. (Position at 7–9). Therefore, the President and Senate have unequivocally indicated that they believe that the government of the HKSAR has the authority to enter into an extradition agreement with the United States.

In an analogous case, the Ninth Circuit found in *Then v. Melendez*, 92 F.3d 851 (9th Cir.1996), that the actions of the government indicating an intention by the United States to negotiate and approve the continuation of an extradition treaty are sufficient to "establish the existence of a constitutionally valid extradition treaty between Singapore and the United States." *Then*, 92 F.3d at 854; *see also Schroder v. Bush*, 263 F.3d 1169, 1174 (10th Cir.2001) (noting that the President alone has the power to negotiate treaties and the Constitution does not contemplate participation by "the Judiciary in any fashion in the making of international agreements"), *cert. denied*, 534 U.S. 1083, 122 S.Ct. 817, 151 L.Ed.2d 700 (2002); *Miami Nation v. United States*, 255 F.3d 342, 346–47 (7th Cir.2001) (noting that the recognition of a government is traditionally an executive function and "lies at the heart of the doctrine of 'political questions.'"), *cert. denied*, 534 U.S. 1129, 122 S.Ct. 1067, 151 L.Ed.2d 970 (2002). Similarly, in determining whether Taiwan was bound by the Warsaw Convention, which was signed by the PRC, but not by Taiwan, the Ninth Circuit recognized that the Constitution "commits to the Executive Branch alone the authority

**2.** Although Coe insists that the Agreement was not authorized by the PRC (Response at 5, 7–8), this assertion is refuted by the record. The legislative history of the Senate's ratification of the Agreement indicates that the PRC did authorize the Agreement. *See Cheung*, 213 F.3d at 93–94 (citing the legislative history of the Agreement and stating that "the Agreement has been authorized by both the previous sovereign (the United Kingdom) and the current sovereign (the People's Republic of China)"). Moreover, the Department of State, in submitting the Agreement to the President, represented that "Hong Kong is entering into the Agreement with the authorization of 'the sovereign government which is responsible for its foreign affairs.' At present, that is the United Kingdom. However, the PRC has also approved the Agreement and authorized its continuation in force after July 1, 1997." (Position, Ex. D at 74, the Department of State's Letter of Submittal for the Agreement, dated February 4, 1997). Additionally, the United States herein has represented to this Court that "[t]he PRC expressly authorized and approved both Hong Kong's negotiation and signing of the treaty." (Position at 6). Thus, to the extent that Coe is contending that the Agreement is invalid because it was not approved by the PRC, his contention must fail.

to recognize, and to withdraw recognition from, foreign regimes." *Mingtai Fire & Marine Ins. Co. v. UPS*, 177 F.3d 1142, 1145 (9th Cir.1999), *cert. denied*, 528 U.S. 951, 120 S.Ct. 374, 145 L.Ed.2d 292 (1999). Thus, the question of the sovereignty of Taiwan was found to be a political question, which could not be addressed by the courts. *Id.* In order to determine the applicability of the Convention in that case, the Ninth Circuit held that it would merely "look to the statements and actions of the 'political departments' in order to answer whether, following recognition of China and derecognition of Taiwan, China's adherence to the Warsaw Convention binds Taiwan." *Id.* Finding evidence of executive and legislative intent to deal separately with Taiwan, the Ninth Circuit found that "Taiwan is not bound by China's adherence to the Warsaw Convention." *Id.* at 1147.

Here, this Court is not in a position to intrude into the political sphere and find, contrary to every indication of executive and legislative intent, that the HKSAR is not a foreign government capable of entering into a treaty with the United States. Because the recognition of foreign regimes is solely within the power of the Executive branch, this Court must defer to the decision by the President and State Department that the HKSAR was a proper foreign entity with which to enter into an extradition agreement.

## V. THE COURT FINDS THAT THE PRESIDENT DID NOT ACT OUTSIDE HIS CONSTITUTIONAL AUTHORITY TO NEGOTIATE TREATIES.

Coe argues that the Court is not precluded by the political question doctrine from examining the enforceability of the Agreement because the key question governing its validity is whether the President has the constitutional authority to enter into a "treaty" with a subsovereign entity.

Because the Second Circuit in *Cheung* did not address this question, Coe claims that its analysis is incorrect. Coe contends that the President's actions in entering into the Agreement violated the Constitution because the Constitution only authorizes treaties with sovereign entities. Further, Coe asserts that this Court must examine the fundamental question of whether the President's actions exceeded the scope of his Constitutional authority. If the Agreement was not Constitutionally authorized, Coe argues, it is not a valid treaty and the Court lacks subject matter jurisdiction to grant the request of the HKSAR for his extradition. (Response at 9–11).

Coe's argument rests on his assertion that "a treaty can only be maintained between nations, not between a nation and a city or region of a country." (Response at 5). In support of this position, he cites *Valentine v. United States*, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936), as standing "for the proposition that treaties may be maintained only between sovereign nations." (Response at 6). But the Supreme Court's statement in *Valentine* that the "power to provide for extradition is a national power; it pertains to the national government and not to the states," was made in reference to the fact that the Constitutional power to negotiate treaties in this country is reserved for the federal government rather than left to the states. 299 U.S. at 8, 57 S.Ct. 100. The issue before the Supreme Court was the validity of an extradition treaty with France that excluded extradition of each country's own citizens. Because the Supreme Court found that it was limited to interpreting the terms of the existing treaty, which clearly excluded the citizens of each country, the Supreme Court concluded that the President was without power to agree to the request of France to extradite two citizens of the United States. In *Valen-*

*tine*, both the United States and France were unquestionably sovereign entities and, thus, the Supreme Court had no occasion to even touch upon the issue presently before this Court. Similarly, in *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), also cited by Coe, the issue before the Supreme Court was whether a defendant could be tried in the United States on a different crime than the one for which Great Britain had extradited him. Coe points to the Supreme Court's quote that "[a] treaty is primarily a compact between independent nations" (*Rauscher*, 119 U.S. at 418, 7 S.Ct. 234), as supporting his position that treaties must be "contracts between nations" and the United States is not authorized to enter into a treaty with a non-sovereign entity. (Response at 6–7). But the issue of the degree of sovereignty required in a foreign government to constitutionally permit the United States to enter into a treaty with it was not relevant to the decision therein, and the quoted language sheds no light on this question.

Coe also references the Ninth Circuit's decision in *Stevenson v. United States*, 381 F.2d 142 (9th Cir.1967). (Response at 6). The Ninth Circuit in *Stevenson* did adopt the definition of "extradition" as being the "surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within the territorial jurisdiction of the other, which, being competent to try and to punish him, demands his surrender." *See Stevenson*, 381 F.2d at 144 (citing *Terlinden v. Ames*, 184 U.S. 270, 289, 22 S.Ct. 484, 46 L.Ed. 534 (1902)). This definition, however, does not pertain to the question herein of whether such a "nation" must be a sovereign entity. In *Stevenson*, the issue before the Ninth Circuit was again unrelated to this issue. There, the Ninth Circuit found that the treaty in question was "irrelevant" because "extradition, as contemplated by the treaty, was not in-

volved" where the individuals were deported by Mexican immigration authorities as undesirable aliens and no extradition proceedings were ever commenced by the United States. *Id.* at 143–44.

Coe also asserts that the Ninth Circuit in *Then* found that a treaty between the United States and Singapore was a valid treaty because "Singapore became a sovereign state" prior to ratification of the continuation of an existing treaty that the United States had entered into with the former colonial power of Singapore, the United Kingdom. (*See* Response at 6). But Coe misconstrues the holding of *Then*. The Ninth Circuit did in fact note that Singapore had become a sovereign state because the change in sovereignty of Singapore was the basis for the challenge to the validity of the extradition treaty in question. But the Ninth Circuit stated this fact in recounting the history of the relations between the United States and the government of Singapore. *See Then*, 92 F.3d at 853. The Ninth Circuit went on to hold that "[t]he continuing validity of the Treaty after Singapore's independence from the United Kingdom presents a political question, and we must defer to the intentions of the State Departments of the two countries." *Id.* at 854. The Ninth Circuit found that "the existence of a constitutionally valid extradition treaty between Singapore and the United States" was based on the "respective State Departments' actions evincing an intent to continue the Treaty between the two nations." *Id.* The fact that Singapore has become a sovereign county was not determinative of the holding. Thus, none of the cases cited by Coe support his argument that treaties are constitutionally limited to sovereign entities.

Article II, section 2 of the Constitution provides that the President has "Power, by and with the Advice and Consent of the

Senate, to make Treaties, provided two thirds of the Senators present concur." Coe's argument that the power given to the President by Article II is limited to treaties executed with sovereign entities is belied by the extensive history of treaties between the United States and the various Indian nations. *See, e.g., County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 231–32, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (detailing the history of treaties entered into with the Oneida Indian Nations and noting that the 1793 revision of the Indian Trade and Intercourse Act provided that no purchase of tribal lands was valid unless "made by a treaty or convention entered into pursuant to the constitution"); *Cheung,* 213 F.3d at 89–90 (noting that at the time the federal extradition statute was passed, the United States had "ratified hundreds of treaties with Indian tribes or nations"). An Indian nation, while retaining some inherent sovereign powers, is not an independent sovereign entity. *See, e.g., Nevada v. Hicks,* 533 U.S. 353, 361, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) ("Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border. Though tribes are often referred to as 'sovereign' entities, it was 'long ago' that the Court departed from Chief Justice Marshall's view that 'the laws of [a State] can have no force' within reservation boundaries.") (citing *Worcester v. Georgia,* 31 U.S. 515, 6 Pet. 515, 561, 8 L.Ed. 483 (1832)); *Montana v. United States,* 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (holding that the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation"). Further, as the Second Circuit found in *Cheung,* Indian treaty parties have "ceded powers generally associated with sovereignty, including the right freely to carry out foreign relations and trade." 213 F.3d at 90. Here, the status of the HKSAR under the Basic Law is analogous to that of the Indian tribes and nations, with whom the President has negotiated countless treaties. *See* Position, Ex. C at 40, Basic Law, arts. 12, 13 (the HKSAR "shall enjoy a high degree of autonomy" but "the Central People's Government shall be responsible for the foreign affairs relating to the [HKSAR]"). Thus, there is nothing in the language of the Constitution or the manner in which it has been interpreted over time to support Coe's contention that the President had no Constitutional authority to enter into an extradition treaty with the HKSAR.

■ Finally, Coe argues that the Agreement is not a "treaty" and, as such, had to be approved by both houses of Congress. In reaching this conclusion, Coe relies on the title of the Agreement and its Letter of Submittal.[3] (Response at 8–9). Coe asserts that the Letter of Submittal requests the Senate to consider the Agreement to be a treaty "for ratification purposes." (Response at 8). The Letter of Submittal from the State Department, however, affirms, "[a]lthough entitled an 'Agreement' to reflect Hong Kong's unique juridical status, **for purposes of U.S. law,** the instrument will be considered to be a

---

**3.** Coe references the Letter of Submittal attached as Exhibit D at 74 of the United State's Position, but refers to the Letter of Submittal as the President's letter sending the Agreement to the Senate. (*See* Response at 8). The Letter of Submittal, however, is the letter from the State Department submitting the Agreement to the President. (*See* Position, Ex. D at 74–79). The President's Letter of Transmittal sending the Agreement to the Senate is attached to the Position as Exhibit D at 73.

treaty." (Position, Ex. D at 74 (emphasis added)). Further, the President, in his Letter of Transmittal to the Senate, indicates that the provisions of the Agreement "follow generally the form and content of extradition treaties recently concluded by the United States" and that, "[a]s a treaty, this Agreement will not require implementing legislation." (*Id.* at 73). It is clear that the Agreement was considered to be a treaty by the State Department and the President, and by the Senate, which ultimately ratified it as such. This Court must defer to the intentions of the political branches of the government in negotiating and approving extradition treaties.[4] *See Mingtai,* 177 F.3d at 1144 ("It is axiomatic that 'the conduct of foreign relations is committed by the Constitution to the political department of the Federal Government; [and] that the propriety of the exercise of that power is not open to judicial review.") (citing *United States v. Pink,* 315 U.S. 203, 222–23, 62 S.Ct. 552, 86 L.Ed. 796 (1942), alteration in original); *United States v. Kin–Hong,* 110 F.3d 103, 106 (1st Cir.1997) ("Fundamental principles in our American Democracy limit the role of courts in certain matters, out of deference to the powers allocated by the Constitution to the President and to the Senate, particularly in the conduct of foreign relations."); *Arnbjornsdottir–Mendler,* 721 F.2d at 681 ("Judicial examination of the existence of extradition treaties has been limited by a Supreme Court decision which stressed the importance of de-

ferring in such cases to the intentions of the State Departments of the two nations."); *Ivancevic v. Artukovic,* 211 F.2d 565, 575 (9th Cir.1954) ("the President, as the Chief of State, in recognizing the continuing validity of treaties between the United States and Serbia has acted upon a reasonable basis of fact peculiarly within his sphere of authority"), *overruled on other grounds by Lopez–Smith v. Hood,* 121 F.3d 1322 (9th Cir.1997), *superseded by statute on other grounds (see Cornejo–Barreto,* 218 F.3d at 1010).

## VI. THE COURT CONCURS WITH THE REASONING EXPRESSED BY THE SECOND CIRCUIT IN *CHEUNG* THAT THE HKSAR IS A "FOREIGN GOVERNMENT" WITHIN THE MEANING OF 18 U.S.C. § 3184.

■ Finally, the Court concurs with the reasoning expressed by the Second Circuit that, to the extent this Court has authority to ascertain whether the government of the HKSAR falls within the meaning of the term "foreign government" in the extradition statute, the statute does not limit the term to foreign sovereigns. *See Cheung,* 213 F.3d at 89, 93. Consequently, the Agreement comports with the requirements of 18 U.S.C. § 3184. As extensively set forth in *Cheung,* the plain language of the text, the objective of the statute, and its legislative history are not inconsistent with an interpretation of the statutory

---

4. Because the Court finds that the Agreement is a "treaty," it is unnecessary to address Coe's argument that the Agreement required legislation passed by both Houses of Congress to be enforceable. (*See* Response at 9). The Court, however, does note that Coe's reliance on *Ntakirutimana v. Reno,* 184 F.3d 419 (5th Cir.1999), *cert. denied,* 528 U.S. 1135, 120 S.Ct. 977, 145 L.Ed.2d 929 (2000), for the proposition that "Congress has the authority to enact extradition agreements with a nonsovereign entity that would not fall under the

President's power to make treaties" is misplaced. The Fifth Circuit in *Ntakirutimana* found that it was "not unconstitutional to surrender Ntakirutimana" pursuant to a statute where the defendant had claimed that it was unconstitutional to extradite him in the absence of a treaty. *Id.* at 427. The Fifth Circuit expressly noted that the power to extradite pursuant to statute co-exists with the President's power to negotiate treaties. *Id.* at 425–27.

term "foreign government" that includes subsovereign entities. *Id.* 89–93. Thus, the Court is free to interpret the statute "in a manner consistent with the United States's extradition commitments," and finds that the extradition agreement with the HKSAR is a valid "treaty" within the meaning of the extradition statute. *Id.* at 93.

## VII. CONCLUSION

Thus, the Court finds as follows:

A.   The Court has subject matter jurisdiction in these proceedings;

B.   The Court has personal jurisdiction over James Coe, aka "Hui Lok-kwan," aka "Hsu Lo-chun";

C.   The Agreement is valid and enforceable, and provides the legal authority for the extradition of Coe to the HKSAR;

D.   Coe is sought for offenses covered by the Agreement; and

E.   There is probable cause to believe that the person before the Court is the person named in the Hong Kong arrest warrants.