Harold BLAKE and Margaret Carlson, Plaintiffs-Appellants and Cross-Defendants,

v.

G. Ray ARNETT, et al., Simpson Timber Company, a corporation, Defendant, Cross-Plaintiff and Appellee.

Nos. 79–4484, 80–4276.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 16, 1981.

Decided Dec. 14, 1981.

Michael Pfeffe, Eureka, Cal., Lester Marston, Escondido, Cal., argued, for Blake; Pauline C. Girvin, Michael Pfeffe, Eureka, Cal., on brief.

Noble K. Gregory, San Francisco, Cal., argued, for Simpson Timber; James N. Roethe, Stephen Stublarec, Peter Townsend, Pillsbury, Madison & Sutro, San Francisco, Cal., on brief.

Before TUTTLE,* DUNIWAY, and ANDERSON, Circuit Judges.

DUNIWAY, Circuit Judge:

Before us are two appeals. No. 79–4484 is from an order of Judge Burke certifying a class of cross-defendants, appealable under 28 U.S.C. § 1292(b). No. 80–4276 is from a summary judgment of Judge Schnacke in favor of Simpson Timber Company and against plaintiffs Blake and Carlson, made appealable under Rule 54(b), F.R. Civ.P.

### I.

We first consider appeal No. 80–4276. We affirm.

---

* The Honorable Elbert Parr Tuttle, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

## A. *Facts.*

Appellants Blake and Carlson are Yurok Indians. The case concerns their claimed rights to enter and cross lands of Simpson Timber Company to exercise Yurok hunting and fishing rights. The lands involved are part of the old Klamath River Indian Reservation in California, a strip of territory commencing at the Pacific Ocean and extending one mile in width on each side of the Klamath river for a distance of approximately 20 miles up river. We refer to this strip as "the Reservation." It is the lower part of a similar strip, over 40 miles long, running from the Ocean to the original Hoopa Valley Indian Reservation at the confluence of the Klamath and Trinity rivers, and now known as the Hoopa Valley Reservation Extension. The history of the Reservation is described in *Mattz v. Arnett,* 1973, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92, in which the Court held that the Reservation had not been terminated, "and that the land within the boundaries of the reservation is still Indian country, within the meaning of 18 U.S.C. § 1151." (*Id.* at 506, 93 S.Ct. at 2258). A map of the Hoopa and Klamath reservations is an appendix to the court's opinion. After the *Mattz* decision the California Court of Appeal held that the state has no authority to regulate hunting and fishing by the Yuroks within the Reservation. *Arnett v. Five Gill Nets,* 1975, 48 Cal.App.3d 454, 121 Cal.Rptr. 906, *cert. denied,* 1976, 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 757. As a result of this decision, plaintiffs no longer seek relief against the other defendants, Arnett, O'Brien, and Snell.

Blake lives on the Reservation, has hunted and fished there all his life, and claims to depend on hunting and fishing, especially the latter, for subsistence. Carlson lives in San Francisco but spends summers camping on land in the Reservation and owned by her and her relatives. She and her family derive much of their food from hunting and fishing on the Reservation. Both claim that their hunting and fishing rights extend to Simpson's lands within the Reservation, and that they are entitled to enter and use those lands to get to their fishing grounds, to fish and to hunt, subject only to such reasonable restrictions as the court may impose to protect Simpson's use of its lands.

Simpson owns a great deal of land within the Reservation. Title to most of this land derives from the titles conveyed to individual Indian allottees by the United States under the General Allotment Act of 1887, 24 Stat. 388. Title to the rest derives from the titles of non-Indians who were granted patents to the land by the United States under the Act of June 17, 1892, 27 Stat. 52. This act opened up the Reservation for non-Indian settlement. Simpson's deeds, and the deeds and patents of its predecessors, purport to convey the lands in fee simple, and they contain no reservation of any servitude for or other provision for hunting or fishing rights in favor of the Yurok tribe or its members.

The court gave summary judgment for Simpson. The relevant portion of the judgment reads:

> Plaintiffs have no right by virtue of their Indian ancestry to use or enter upon the lands owned in fee simple by Simpson Timber Company situated within the Hoopa Extension Indian Reservation.

Plaintiffs do not assert that it was error to include the entire Hoopa extension, rather than just the lower 20 mile Reservation.

## B. *Discussion.*

Blake and Carlson argue that the Yuroks' right to hunt and fish on the Reservation lands was not extinguished by the acts of 1887 and 1892. They point to the long settled policy that statutes be liberally interpreted to favor the Indian tribes, to the fact that fishing and hunting rights can survive even the termination of a tribe (*Menominee Tribe v. United States,* 1968, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697), and to the fact that no language in the statutes of 1887 or 1892 explicitly extinguished the hunting and fishing rights. They rely heavily on *United States v. Winans,* 1905, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089. On the other hand, Simpson points to the language of its deeds and patents and to

the language and purpose of the acts of 1887 and 1892. It would distinguish *United States v. Winans* as involving Indian rights based on treaty rather than on statute or executive order.

The plaintiffs might prevail on either of two theories. One theory is that when the United States made allotments and granted patents it gave no better title than it had, and its title was encumbered by a prior grant of or reservation of a fishing and hunting interest to the Indian tribe or its members, or both. This first theory did prevail in *United States v. Winans, supra.* There the Yakima Nation had by treaty in 1858 ceded certain territories but reserved to itself "the right of taking fish in all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them." 198 U.S. at 378, 25 S.Ct. at 663. The Court reasoned that the treaty reserved the rights and thus imposed a servitude on the land in the "usual and accustomed places."

In its opinion, the *Winans* Court pointed out that the Indians had possessed hunting and fishing rights long before the white man came, and that hunting and fishing rights "were not much less necessary to the existence of the Indians than the atmosphere they breathed" (198 U.S. at 381, 25 S.Ct. at 664). The same could be said of the Yurok Indians in this case at the time when the Reservation was first created.. The Court next construed the treaty as reserving the rights rather than granting them. It held that the rights were "intended to be continuing against the United States and its grantees.... The construction of the treaty disposes of certain subsidiary contentions of respondents. The Land Department could grant no exemptions from its provisions. It makes no difference, therefore, that the patents issued by the Department are absolute in form. They are subject to the treaty as to the other laws of the land." *Id.* at 381–82, 25 S.Ct. at 664.

*Winans* goes farther in support of the Indians than it would be necessary to go in our case. At least some of the lands involved there were never a part of an Indian reservation. Here, all that is claimed is rights in lands in a reservation two miles wide and twenty miles long, on each side of a river in which the Indians have always fished. However, for reasons stated later in this opinion, we do not think that *Winans* controls this case.

▮▮▮ Congress can create a reservation, reserve rights to the Indians, and dispose of lands of the United States by statute as well as by treaty. *Hynes v. Grimes Packing Co.,* 1949, 337 U.S. 86, 103–04, 69 S.Ct. 968, 979, 93 L.Ed. 1231. Thus, when a reservation is created by statute, or by Executive order under the authority of a statute, the Indians may be given a right in land. The history of the creation of the reservation here in question is complex. It was not created by treaty. The California Court of Appeal found that it was created by statute, at least for the purposes of the statutory phrase "immunity afforded under Federal ... statute." *Arnett v. Five Gill Nets, supra* (construing 18 U.S.C. § 1162(b)). Even so, whether a treaty or statute is to be read to create a right in land depends upon its language or purpose. *Hynes v. Grimes Packing Co., supra.*

▮▮▮ We do not think that the distinction between a treaty and a statute has great significance. Before 1871, relations between the United States and Indians were frequently established by treaties with Indian nations which were held to be independent sovereign powers under the protection of the United States. *E. g., Worcester v. Georgia,* 1832, 31 U.S. (6 Pet.) 515, 559–560, 8 L.Ed. 483. In 1871, Congress determined that "no Indian nation or tribe within the United States shall be acknowledged or recognized as an independent nation, tribe or power with whom the United States may contract by treaty...." 16 Stat. 566, now 25 U.S.C. § 71.

▮▮▮ However, first, both treaties and statutes are the supreme law of the land. Const. Art. VI, cl. 2. Second, the real power had lain with the United States alone long before 1871. Some at least of the treaties were the embodiment of orders im-

posed on Indians by the Executive. On occasion the United States invented tribes and appointed their chiefs. *Washington v. Washington State Commercial Fishing Vessel Association*, 1979, 443 U.S. 658, 664 n.5, 99 S.Ct. 3055, 3064 n.5, 61 L.Ed.2d 823. Third, the change from treaty to statute was at least in part the result of political infighting in Congress. The House was excluded from the treaty making process under Const. Art. II, § 2, cl. 2, and it wished to have a greater say in Indian policies. *Antoine v. Washington*, 1975, 420 U.S. 194, 202, 95 S.Ct. 944, 949, 43 L.Ed.2d 129. Fourth, as regards Indians, there is no clear cut distinction between treaties and statutes, nor any clear division between what was done by treaty and what was done by statute. Both treaties and statutes were worded in a wide variety of ways, some explicitly granting fee simple interests to tribes, some explicitly granting only Indian title (a right of occupancy at the pleasure of the United States), some saying no more than that land was reserved for Indian occupancy, some expressly reserving or granting rights, some silent on the subject. United States Department of the Interior, *Federal Indian Law*, 601–622 (1958). Finally, it is clear that Congress has the power to cancel unilaterally rights granted by Indian treaty. *Lone Wolf v. Hitchcock*, 1903, 187 U.S. 553–566, 23 S.Ct. 216–21, 47 L.Ed. 299; *The Cherokee Tobacco*, 1871, 78 U.S. (11 Wall) 616, 621, 20 L.Ed. 227. For all of these reasons we believe that whether the source of a right is in a treaty or in a statute is of little contemporary relevance.

The second theory on which Blake and Carlson might prevail is that, while the United States did have full title and appeared to give this title to individuals, in fact it gave its grantees less than it had. They urge that to construe the acts of 1887 and 1892 as extinguishing hunting and fishing rights related to Reservation land now held by Simpson is contrary to the rule that statutes must be construed in favor of the Indian tribe. Thus, appellants argue that even though Congress could have extinguished these rights, it did not do so.

If plaintiffs are to prevail on either of these theories it must be that the Yurok tribe or its individual members have some interest in the lands now held by Simpson. This interest, if it exists, is a form of equitable servitude that benefits the tribe and burdens the land, whoever owns it. Such an encumbrance on land may not fit easily into the established categories of the common law or equity, but we do not regard this as fatal to it.

On the other hand, Simpson will prevail if the United States had full title and conveyed it to individual owners or if the United States, in giving them title, cut off or destroyed the plaintiffs' rights.

We need not decide today whether the issuing of allotments or the granting of patents required compensation for loss of fishing and hunting rights by those to whom the rights had previously been reserved by treaty or statute. Apparently this question has never been expressly decided by the Supreme Court. Chambers, Judicial Enforcement of the Federal Trust Responsibility to Indians, 27 Stanford L.Rev. 1213, 1226 n.65 (1975). It is not before us in this case.

To determine whether or not Simpson has an unencumbered title to the land it holds we look to the acts of 1887 and 1892. The wording of the federal patents does not settle the issue. *United States v. Winans*, *supra; Choate v. Trapp*, 1912, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941. The statute of 1887, 24 Stat. 388, was applicable to nearly all Indian Reservations (§ 1) except a few specifically named (§ 8). It clearly applied to the Reservation here involved, and it authorized the granting of allotments "in severalty" (§ 1) and "for the sole use and benefit of the Indian to whom such allotment shall have been made." (§ 5). After the trust period, the land was to be conveyed by patent, "in fee ... and free of all charge and incumbrance whatsoever." (§ 5). The purpose of the Act was to encourage assimilation of Indians to American cultural patterns. *Colville Confederated Tribes v. Walton*, 9 Cir., 1981, 647 F.2d 42, 49.

Under *Winans*, patents did not cut off the fishing and hunting rights there involved, which were expressly reserved by treaty. Here, whether we look to the Executive Order of 1855 that created the old Klamath River Indian Reservation (*see Mattz v. Arnett, supra,* 412 U.S. at 483–484, 93 S.Ct. at 2247) or to the Executive Order of 1891, which created the Hoopa Valley Reservation Extension (*Id.* at 493, 93 S.Ct. at 2252), we find no such express reservation or creation of fishing or hunting rights. This may be because all of the reservation, when created, was riparian to the Klamath River, thus affording complete access for fishing by the reservation Indians to the lower twenty miles of the river. It probably did not occur to anyone to mention fishing rights. Similarly, the tribe occupied the reservation and could of course hunt upon it, so long as no action by the United States prevented it.

■ We conclude that Congress intended that the allotments and patents, granted under the Act of 1887, would grant an unencumbered title to the Indian allottees and their successors in interest, which would not be subject to any interest in the land that might be implied from the mere creation of the reservation. As we observed in *Colville Confederated Tribes v. Walton,* 9 Cir., 1981, 647 F.2d 42, 50, "By placing allotted lands in trust for 25 years, Congress evinced an intent to protect Indians by preventing transfer of those lands. But there is no basis for an inference that some restrictions survived beyond the trust period. Congress provided for extensions of the trust period, but directed that fee title be conveyed to the allottee when the period expired." We think the fee excluded the interests asserted by the plaintiffs. The policy represented by the Act of 1887 is now regarded by many as wrongheaded, but we cannot say that Congress did not then regard it as a proper way to fulfill its duty of trust to the Yurok people.

■ The language of the Act of 1892, 27 Stat. 52, is less explicit. The land of the Klamath River Reservation is "declared to be subject to settlement, entry, and pur-chase under the laws of the United States granting homestead rights and authorizing the sale of mineral, stone, and timber lands. . . ." (§ 1). Reference is also made to the Act of 1887. (*Id.*) There can be no real doubt that it was intended that non-Indian settler-purchasers would take a fee-simple in the Indian land. Patents issued under the acts referred to are said to be "the most accredited type of conveyance known to our law." (*United States v. Cherokee Nation,* Ct.Cl., 1973, 474 F.2d 628, 634, fn. 16). We have also held that a patent pursuant to the homestead laws conveys all incidents of title free from any implied easement. *United States v. Clarke,* 9 Cir., 1976, 529 F.2d 984. *See also Leo Sheep Co. v. United States,* 1979, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677.

Although the recent decision in *Montana v. United States,* 1981, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), is not directly in point, the discussion in Part III of Justice Stewart's opinion, of the Crow's attempt to regulate hunting and fishing by non-Indians on reservation land owned in fee by non-members of the Tribe (at 556–569, 101 S.Ct. at 1254–59), strongly supports the conclusion that we have reached in this case. See particularly fn.9 at 559–60, 101 S.Ct. at 1255–56 regarding the Allotment Acts. *See also Oliphant v. Suquamish Indian Tribe,* 1978, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209.

The judgment appealed from in No. 80–4276 is correct.

## II.

We next consider appeal No. 79–4484. We modify the order and affirm it as modified.

In its "Counterclaim and Third Party Complaint," Simpson named Blake and Carlson as class representatives of "all Yurok Indians or other Indians" claiming "similar interests" to those claimed by Blake and Carlson. As we have seen, Blake and Carlson claim special hunting and fishing rights, on the Reservation only—i. e., on the lower twenty miles of the Klamath

River, and a strip one mile wide on each side of it. They allege that "all of the Lower Klamath (Yurok) Indians, including plaintiffs, obtained or were guaranteed certain hunting and fishing rights." They limit their claim to Yurok Indians only. They claim that Yuroks have the right "to cross, stop upon, and hunt and fish upon" Simpson's property within the Reservation.

In its motion to certify a class, Simpson asked to expand the action to include all other Indians than Yuroks, including specifically the Hoopas, who do or may claim similar rights, and to deal with lands in the so-called "connecting strip" or upper half of the Hoopa Valley Reservation Extension and in the original Hoopa Valley Reservation—the so-called Hoopa square. Simpson alleged that there are 3,849 Yuroks and 1,498 Hoopas.

Blake and Carlson do not wish to represent the class, but the court found them to be "representative parties who will fairly and adequately protect the interests of other unnamed class members." However, the court's order certifying the class does not name either of them, or anyone else, as representatives of the defendant class. The order establishes the following class:

> All Indians (including all Yurok and Hoopa Indians) who, by virtue of their Indian ancestry, have hunting and fishing rights within the old Klamath River Reservation and the Connecting Strip, i. e., the one-mile strip of land on either side of the Klamath River in California, running from the mouth of the Klamath to 40 miles upstream at the confluence of the Klamath and Trinity Rivers, and who thus may claim an interest in land owned by Simpson Timber Company within the boundaries of said reservation and connecting strip.

The order thus expands the case to include claims of "all Indians," including the Hoopas, and to deal with lands in the entire 40 + mile Hoopa Valley Extension rather than in just the lower 20 miles (the old Klamath River Reservation).

■ A class action must satisfy the requirements of F.R.Civ.P. Rule 23(a) and at least one of the requirements of Rule 23(b). *Green v. Occidental Petroleum Corp.*, 9 Cir., 1976, 541 F.2d 1335, 1339. Requirement (1) of Rule 23(a), numerosity, is satisfied; there are 3,849 Yuroks and 1,498 Hoopas. Requirement (2) is satisfied; there are questions of law common to the class. If the Yuroks have hunting and fishing rights on Simpson's lands, they have them because they are Yuroks. If the Hoopas have such rights, it is because they are Hoopas. Requirement (3) is satisfied, at least in part. Plaintiffs' claims appear to be typical of the claims of all Yuroks. They may or may not be typical of the claims of the Hoopas, however. Requirement (4) raises some doubts in our minds, because the two plaintiffs do not wish to represent the class at all. Nevertheless, we think that, where a defendant class is involved, the court can designate representatives over whom it already has jurisdiction, even if they do not wish to serve. Here, the questions presented appear to be questions of law: do (1) the Yuroks or (2) the Hoopas have the claimed rights in Simpson's lands because they are Yuroks or because they are Hoopas? The question, as to the Yuroks, has been well presented by the plaintiffs' counsel, California Indian Legal Services, both here and in the trial court. We think that counsel can fairly and adequately protect the interests of the Yurok class. We are not so sure, however, whether plaintiffs or their counsel should be called upon to represent the Hoopas.

■ The judge found that the requirements of Rule 23(b)(1) and (2) were also met. As to requirement (1)(A), the judge found the possibility of varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Simpson. We doubt the validity of this finding. A final decision of this court (or of the Supreme Court if it were to grant certiorari) would settle the legal issue presented, and would presumably control the decision in any other case. However, the judge also found that the requirements of (2) are met, and, at least as to the Yuroks, we agree. Simp-

son's position is the same as to all of them, so that final injunctive or declaratory relief is appropriate with respect to the class as a whole.

■ Plaintiffs argue that the class is inappropriate because it does not include the Yurok and Hoopa tribes, which may have fishing and hunting rights on behalf of their members, different from those of individual Indians. They also remind us that the tribes, by reason of sovereign immunity, cannot be sued. *Santa Clara Pueblo v. Martinez*, 1978, 436 U.S. 49, 58–59, 98 S.Ct. 1670, 1676–77, 56 L.Ed.2d 106; *Puyallup Tribe, Inc. v. Dep't of Game of Washington*, 1977, 433 U.S. 165, 172–173, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667. Therefore, plaintiffs say, the tribes cannot be made members of the class. They also say that the absence of the tribe will mean that the court cannot make an effective final determination of the question that Simpson seeks to litigate. To all of this there are answers.

First, because we hold that the Hoopas should not be included in the class, the absence of the Hoopa Tribe has become immaterial. Moreover, there is a question whether there is such a thing as an organized Yurok Tribe; so far as the record shows, there is not.

Second, plaintiffs themselves are asserting personal rights, founded upon their status as Yuroks, to enter, cross, and use Simpson's lands for hunting and fishing. It is only similar rights of other Yuroks that Simpson seeks to have litigated in its cross-action. The fact that it cannot litigate against the Tribe, either because the tribe has sovereign immunity or because it does not exist, should not bar Simpson's cross-action. Obviously, the ultimate judgment cannot bar the tribe. But that does not mean that the action cannot be maintained against individual Yuroks. *Puyallup Tribe, supra*, 433 U.S. at 173, 97 S.Ct. at 2621.

In short, we conclude that the class action is appropriate as to the Yuroks. We also conclude, however, that it is not appropriate, as to the Hoopas. In the first place, there is no showing that any Hoopas have made claims similar to the claims of the Yuroks. In the second place, neither of the plaintiffs is a Hoopa, and there is evidence of some disagreement between the Hoopas and the Yuroks as to the rights that accrue to them in their capacities as reservation Indians. *See Short v. United States*, Ct.Cl., 1973, 486 F.2d 561, regarding conflicting claims of Yuroks and Hoopas to the profits realized from timber, the Yuroks claiming a share of profits from timber located on the old Hoopa reservation (the "Hoopa Square"). It appears also that there have been complaints by the Hoopas that the fishing activities of the Yuroks on the Reservation and the Connecting link are damaging the fishery in the Hoopa Square. We conclude that the evidence does not support the court's finding that "the interests of the Yurok and Hoopa Indians . . . coincide precisely" in this case. Given that the two plaintiffs here are Yuroks, we must conclude that the finding that plaintiffs will fairly and adequately protect the interests of the Hoopa members of the class is not supported by the evidence. Moreover, because the Hoopa Square had a quite different origin from the Reservation, and the Connecting Strip had a still different origin, and because the history of each is different, and because the Act of 1892 does not apply to the Hoopa Square or the Connecting Strip, we conclude that there is a sufficient likelihood of conflict of interest between the Yuroks and the Hoopas, and a sufficient likelihood of inadequate representation of the Hoopas by the plaintiffs, to make the inclusion of the Hoopas in the class an abuse of discretion.

None of the cases cited in any of the briefs is squarely in point, and we think it unnecessary to expand this opinion by discussing them. The prerequisites for class actions are clearly stated in Rule 23, and the cases merely apply the Rule to various fact situations. There are few cases dealing with involuntary representatives of a defendant class or classes. We think, however, that the courts should be reluctant to designate such representatives for members of the class as to whom the designated representatives assert that there are con-

flicts of interest. What zeal are the representatives likely to show in defending the claims of persons whose claims the representatives wish to deny?

In No. 80–4276, the judgment appealed from is affirmed.

In No. 79–4484, the order appealed from is modified by striking from the description of the class in paragraph 2 the words "All Indians (including all Yurok and Hoopa Indians)" and substituting for those words the following: "All Yurok Indians," and by inserting at the end of paragraph 2 the following:

> Plaintiffs and cross-defendants Harold Blake and Margaret Carlson are hereby designated as representative parties on behalf of all members of the class.

As so modified, the order is affirmed.