**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL WANG,
  *Petitioner-Appellant,*

v.

ROBERT MASAITIS, U.S. Marshal,
  *Respondent-Appellee.*

No. 04-55772

D.C. No.
CV-03-07470-CAS

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
February 7, 2005—Pasadena, California

Filed July 27, 2005

Before: Warren J. Ferguson, John T. Noonan, and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Hawkins;
Dissent by Judge Ferguson

**COUNSEL**

Hoyt Sze, Office of the Federal Public Defender, Santa Ana, California, for the petitioner-appellant.

Mark C. Krause, Office of the United States Attorney, Los Angeles, California, for the respondent-appellee.

**OPINION**

HAWKINS, Circuit Judge:

We must decide whether, under the Treaty Clause of the Constitution, the United States may enter into a "treaty" with a non-sovereign entity, such as Hong Kong. We conclude that such a treaty is constitutional, and therefore uphold the validity of the "Agreement Between the Government of the United States of America and the Government of Hong Kong for the Surrender of Fugitive Offenders" ("Extradition Agreement"). We also hold that a magistrate judge has jurisdiction under the

Federal Magistrates Act to issue a Report and Recommendation ("R & R") regarding a habeas petition without the defendant's explicit consent.

## I. BACKGROUND

In 2003, Hong Kong Magistrate Bina Chainrai issued a warrant authorizing Michael Wang's arrest. The warrant listed eighteen counts of theft (adding up to $15,834,000 in Hong Kong currency) and two counts of dealing with property known or believed to represent proceeds of an indictable offense. After the Hong Kong Department of Justice formally requested Wang's surrender pursuant to the Extradition Agreement, the United States filed a request to extradite him. United States Magistrate Judge Rosalyn M. Chapman held a hearing, found that all of the requirements for the extradition had been met, and issued an order certifying Wang's extraditability.

Wang filed a habeas petition challenging the extradition order, contending (1) that the court lacked subject matter jurisdiction to certify extradition because the Extradition Agreement between the United States and Hong Kong is not a proper "treaty" under the Constitution, and (2) that no probable cause supports certain charges against him. Wang's habeas petition was heard by Magistrate Judge Chapman, who issued a R & R to District Judge Christina A. Snyder. Although Wang did not explicitly consent to Magistrate Judge Chapman's review of his habeas petition, Wang made no objection to her appointment. Judge Snyder conducted a de novo review of the R & R, approved and adopted the R & R, and entered an order denying the petition for habeas corpus.

## II. DISCUSSION

On July 1, 1997, the United Kingdom returned sovereignty over Hong Kong to China. *See* 22 U.S.C. § 5701. The Hong Kong Special Administrative Region ("HKSAR") of China

was set up "to enjoy a high degree of autonomy on all matters other than defense and foreign affairs." *Id*. The transfer of sovereignty implemented a "one country, two systems" policy, "under which Hong Kong will retain its current lifestyle and legal, social, and economic systems until at least the year 2047." *Id*.

From 1977 to June 30, 1997, extradition relations between the United States and Hong Kong were governed by an extradition treaty between the United States and the United Kingdom. In light of the transfer of sovereignty over Hong Kong from the United Kingdom to China, the United States and Hong Kong concluded the Extradition Agreement, for which President Clinton requested the Senate's advice and consent to ratify "as a treaty." China had already approved Hong Kong entering into the agreement. The Senate subsequently ratified the Extradition Agreement. *See* 143 Cong. Rec. S 11165 (Oct. 23, 1997).[1]

A. *Political Question*

The government argues that the constitutionality of the Extradition Agreement is a nonjusticiable political question, framing the issue as whether Hong Kong is a "sufficiently sovereign foreign power for the purpose of entering into a treaty." However, this court need not decide the status of Hong Kong's sovereignty. Rather, the constitutional issue that Wang has raised is whether the term "treaty" in the Treaty Clause encompasses agreements with non-sovereigns, such as Hong Kong — and that question is clearly justiciable under *Baker v. Carr*, 369 U.S. 186, 217 (1962).

The Second Circuit's separation of justiciable and nonjusticiable issues regarding the Hong Kong Extradition Agreement is instructive:

---

[1]The Department of State listed the Extradition Agreement in "Treaties in Force, A List of Treaties and Other International Agreements of the United States in Force on January 1, 2004."

Federal courts lack the authority and institutional competence to make the political judgments involved in ascertaining the legitimacy of foreign systems. Thus, in this case, it is not for the courts to decide whether the HKSAR government is a legitimate government. Instead, our role is limited to answering the prior definitional question: what does the term "foreign government" in the extradition statute mean? More precisely, the question we must answer is whether the government of a subsovereign constitutes a "foreign government" or the government of a "foreign country" for purposes of [18 U.S.C.] § 3184. Put another way, for most purposes of United States foreign relations, the HKSAR government is the government of Hong Kong because it has been recognized as such by the Executive, but it is a "foreign government" within the meaning of the extradition statute only if the judiciary interprets that term to encompass subsovereigns.

*Cheung v. United States*, 213 F.3d 82, 89 (2d Cir. 2000) (citing *Baker v. Carr*, 369 U.S. at 212). Though we answer a slightly different definitional question — whether the President may enter into a treaty with a non-sovereign under the Treaty Clause — the principle is the same, relying on *Baker*'s distinction between discerning a nation's sovereignty (a political question) and interpreting the impact of that status on the law (a judicial one):

While recognition of foreign governments . . . strongly defies judicial treatment . . . and the judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory, once sovereignty over an area is politically determined and declared, courts may examine the resulting status and decide independently whether a statute applies to that area.

369 U.S. at 212 (footnote omitted). China's sovereignty over Hong Kong (and by corollary Hong Kong's subsovereign status) has been resolved by the executive branch, and we do not question that judgment. However, this court may examine the resulting status of Hong Kong, and decide whether the Treaty Clause applies to Hong Kong as a constitutionally cognizable treaty party.

*Baker*'s six factors to determine whether an issue is a nonjusticiable political question supports finding justiciability here:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id*. at 217. "Unless one of these formulations is *inextricable* from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence." *Id*. (emphasis added).

**[1]** Justice Powell distilled the *Baker* test into three inquiries: "(i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do

prudential considerations counsel against judicial intervention?" *Goldwater v. Carter*, 444 U.S. 996 (1979) (Powell, J., concurring). In applying the *Baker/Goldwater* factors, it is important to note that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," *Baker*, 369 U.S. at 211, and that "not every matter touching on politics is a political question." *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 229 (1986) (citing *Baker*, 369 U.S. at 209).

1. *No Textually Demonstrable Commitment*

**[2]** The issue here is whether the term "treaty" in the Treaty Clause encompasses agreements with non-sovereigns. On this issue of constitutional interpretation, there is no "textually demonstrable constitutional commitment of the issue to a coordinate political department," *Baker*, 369 U.S. at 217, i.e. to the President. Rather, the text is silent, and the dissent concedes as much. (*See* Dissent at 8661-62.)

2. *No Lack of Judicially Discoverable and Manageable Standards; No Requirement for an Initial Policy Determination*

**[3]** The second *Goldwater* factor lumps together the second and third *Baker* inquiries — whether there is "a lack of judicially discoverable and manageable standards" and whether a decision is impossible "without an initial policy determination of a kind clearly for nonjudicial discretion." *See Goldwater*, 444 U.S. at 999 (Powell, J., concurring). Nowhere do we make an explicit or implicit policy determination that an extradition agreement, or foreign relations generally, with Hong Kong is a good or bad thing. The neutral analysis of the Indian treaty line of cases to fill in the silence of the Treaty Clause utilizes regular means of constitutional interpretation. "Resolution of the question may not be easy, but it only requires us to apply normal principles of interpretation to the constitutional provisions at issue." *Cf. id.* The dissent's dis-

agreement with the Indian treaty analogy does not make the analysis judicially unmanageable or policy-oriented.

### 3.   *Prudential Considerations*

**[4]** The remaining *Baker* inquires may be seen as prudential considerations, the third of the *Goldwater* inquiries. The dissent is concerned that addressing the requirements of the Treaty Clause would risk the nation's ability to speak with one voice in the field of foreign affairs with Hong Kong. (Dissent at 8669.) Though a valid concern, it is overstated. Even if the court were to find that the Treaty Clause did not encompass agreements with non-sovereigns, the President could still enter into an executive agreement, or pass legislation with both houses of Congress, that would establish identical extradition obligations (and other treaty obligations) between the United States and Hong Kong.

**[5]** The court is "cognizant of the interplay" between the interpretation of the Treaty Clause and the conduct of this Nation's foreign affairs, but one of the judiciary's characteristic roles is to interpret the Constitution, and "we cannot shirk this responsibility merely because our decision may have significant political overtones." *Cf. Japan Whaling*, 478 U.S. at 230 (addressing whether two statutes required the Secretary of Commerce to act contrary to an executive agreement, despite contention of "embarrassment from multifarious pronouncements by various departments"). Thus, we conclude that the issue presented is justiciable.

### B.   *The United States May Enter Into a Treaty with a Non-Sovereign*

We review whether a constitutionally valid extradition treaty exists de novo. *In the Matter of Then v. Melendez*, 92 F.3d 851, 853 (9th Cir. 1996).

1. *The Text, Framer's Intent, and the Indian Treaties*

**[6]** The text of the Treaty Clause of the United States Constitution[2] and the extradition statute[3] are silent as to the definition of the term "treaty." "The power to make treaties is given by the Constitution in general terms, without any description of the objects intended to be embraced by it. . . ." *Holmes v. Jennison*, 39 U.S. 540, 569 (1840). Treaties enacted pursuant to Article II receive a presumption of constitutionality. *See In re Aircrash in Bali, Indonesia on April 22, 1974*, 684 F.2d 1301, 1309 (9th Cir. 1982).

**[7]** Wang argues that the United States cannot constitutionally enter into a "treaty" with a non-sovereign such as Hong Kong. However, there is no credible source that supports the proposition that the Treaty Clause permits *only* a treaty with a sovereign nation. Indeed, it would be difficult for the Founders to have this thought at the drafting of the Constitution, since, as Wang concedes, non-sovereign entities "were not prevalent in 1787."

The Second Circuit has upheld the constitutionality of the Hong Kong Extradition Agreement.[4] *See Cheung*, 213 F.3d 82. The reasoning of the Second Circuit is persuasive:

> Although the term "treaty" is commonly understood in modern usage as a "contract[ ] between independent nations," the term was not necessarily so lim-

---

[2]The Treaty Clause states that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." U.S. Const. Art. II, § 2, Cl. 2.

[3]18 U.S.C. § 3184 authorizes extradition of fugitives from foreign countries "[w]henever there is a treaty or convention for extradition between the United States and any foreign government."

[4]Ninth Circuit, Tenth Circuit, and Fourth Circuit district courts have also upheld this treaty. *In Re Coe*, 261 F. Supp. 2d 1203 (C.D. Cal. 2003); *In the matter of Seong-I*, 346 F. Supp. 2d 1149 (D. N.M. 2004); *United States v. Sai-Wah*, 270 F. Supp. 2d 748 (W.D. N.C. 2003).

ited in the mid-19th century (or now) when the federal extradition statute was enacted. It is true that at the time Congress passed the act, the United States had ratified only two extradition treaties, both with sovereign nations — France and England. However, the United States had also ratified hundreds of treaties with Indian tribes or nations. From the first years of our constitutional republic, the Indian treaties have enjoyed a status "on a par with foreign treaties." This has been the case even though Indian treaty partners have been described as "domestic dependent nations" insofar as they had ceded powers generally associated with sovereignty, including the right freely to carry out foreign relations and trade.

Thus, it is clear that the term "treaty" had a meaning broader than an agreement between fully sovereign or independent entities.

*Cheung*, 213 F.3d at 89-90 (citations omitted).

[8] The Supreme Court's treatment of United States treaties with Indian nations, despite an evolving debate about their sovereignty status,[5] as constitutionally valid, *see, e.g.*, *United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 196 (1876),[6] *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204 (1999),[7] strongly suggests that the Treaty

---

[5] As the Supreme Court described in *United States v. Lara*, 124 S. Ct. 1628, 1634-35 (2004), Congress has "authorized at different times very different Indian policies;" "[s]uch major policy changes inevitably involve major changes in the metes and bounds of tribal sovereignty."

[6] "From the commencement of its existence, the United States has negotiated with the Indians in their tribal condition as nations, dependent, it is true, but still capable of making treaties."

[7] In discussing an 1837 treaty with the Chippewa Indians, the Court stated:

Indian treaty rights can coexist with state management of natural resources. Although States have important interests in regulating

Clause does not preclude the United States from entering into treaties with non-sovereigns.

### 2. *The Significance of 25 U.S.C. § 71*

Wang also argues that the 1871 implementation of 25 U.S.C. § 71,[8] which prohibits future contracts "by treaty" with Indian nations (without invalidating or impairing prior treaties), demonstrates that the Congress and President interpreted the term "treaty" only as an inter-sovereign agreement. Thus, Wang argues that *Cheung* incorrectly concluded that the United States may enter into a treaty with a non-sovereign "by mistakenly assuming that pre-1871 Indian tribes were non-sovereign entities."

[9] First, it is a stretch to argue that based on United States relations with Indian nations via an 1871 statute, without any interpretation of the Treaty Clause, the term "treaty" should be *constitutionally* defined solely as between two sovereigns.[9] Whatever the Congress and the President may have believed in 1871 about treaties and sovereignty, it is well-established that it is the judicial branch that is endowed with the duty of

---

wildlife and natural resources within their borders, this authority is shared with the Federal Government when the Federal Government exercises one of its enumerated constitutional powers, such as treaty making. U.S. Const., Art. VI, cl. 2.

(citing, as an example, *Forty-Three Gallons of Whiskey*, 93 U.S. 188).

[8] 25 U.S.C. § 71 states, in relevant part: "No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired."

[9] It is worth noting that the 1871 passage of 25 U.S.C. § 71 had as much to do with the irritation of the House of Representatives with being left out from the regulation of Indian affairs as it had to do with Indian sovereignty. *See Blake v. Arnett*, 663 F.2d 906, 910 (9th Cir. 1981) (describing 1871 Act "at least in part the result of political infighting in Congress.").

constitutional interpretation. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). And, to date, there is no Supreme Court precedent specifically holding that a treaty between a sovereign and non-sovereign is unconstitutional.

Second, as *Cheung* points out, pre-1871 decisions did refer to Indian nations as non-sovereign, or at least as less than fully sovereign. *See, e.g.*, *Cherokee Nation v. Georgia*, 30 U.S. 1, 17-18 (1831);[10] *see also Johnson v. M'Intosh*, 21 U.S.

_____

[10]The Supreme Court recounted the status of Indian tribes:

[Indian tribes] are considered as within the jurisdictional limits of the United States, subject to many of those restraints which are imposed upon our own citizens. They acknowledge themselves in their treaties to be under the protection of the United States; they admit that the United States shall have the sole and exclusive right of regulating the trade with them, and managing all their affairs as they think proper . . . . Treaties were made with some tribes by the state of New York, under a then unsettled construction of the confederation, by which they ceded all their lands to that state, taking back a limited grant to themselves, in which they *admit their dependence*.

Though the Indians are acknowledged to have an unquestionable, and, heretofore, unquestioned right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our government; yet it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. *They may, more correctly, perhaps, be denominated domestic dependent nations.* They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian.

They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the president as their great father. *They and their country are considered by foreign nations, as well as by ourselves, as*

543, 574 (1823) (Indian "rights to complete sovereignty, as independent nations, were necessarily diminished"); *but see Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832) (describing Indian nations as "distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil").

[10] Thus, the United States' history of treaties with non-sovereign Indian nations fills in the silence of the Treaty Clause and the extradition statute with respect to the term "treaty": it is constitutional for the United States to enter into a treaty with a non-sovereign, such as Hong Kong.

C. *Appointment of Same Magistrate Judge to Handle Extradition Certification and Habeas Challenge Was Proper*

[11] We review the "scope of authority and powers of a magistrate judge" de novo. *United States v. Sanchez-Sanchez*, 333 F.3d 1065, 1068 (9th Cir. 2003). The jurisdiction and powers of magistrate judges are enumerated in 28 U.S.C. § 636 of the Federal Magistrates Act. Section 636(b)(1)(A) allows a district judge to designate a magistrate to hear and determine any pretrial matter, except eight types of motions (none of which pertain to Wang's case). Section 636(b)(1)(B) permits a district judge to designate a magistrate to conduct hearings and submit proposed findings of fact and recommendations for the disposition of (1) any motion excepted in § 636(b)(1)(A), (2) applications for posttrial relief made by individuals convicted of criminal offenses, and (3) prisoner petitions challenging conditions of confinement. Finally, there

---

*being so completely under the sovereignty and dominion of the United States*, that any attempt to acquire their lands, or to form a political connexion with them, would be considered by all as an invasion of our territory, and an act of hostility.

30 U.S. at 17-18 (emphasis added).

is a catch-all provision, § 636(b)(3), which permits a district court judge to assign the magistrate any additional duties not inconsistent with the Constitution and the laws of the United States.

The United States District Court for the Central District of California issued General Order 01-13, which fills in specific additional duties assigned to magistrate judges. Federal habeas corpus petitions and extradition proceedings are among the types of cases assigned to magistrates. The Order explains that once a case is randomly assigned to a magistrate judge for a report and recommendation (as Magistrate Judge Chapman was assigned to Wang's extradition proceeding), all subsequent habeas corpus cases filed by the same party shall be assigned to the same magistrate judge. Thus, under General Order 01-13, Magistrate Judge Chapman was well within her authority to issue a R & R for Wang's habeas petition. The issue presented here is whether, in this scenario, the magistrate judge exceeded the authority granted under § 636(b)(3) — the catch-all provision.[11]

[12] Wang argues that Magistrate Judge Chapman lacked jurisdiction under § 636 to submit a R & R because he did not explicitly consent to his habeas petition being handled by a magistrate. Under *United States v. Gomez-Lepe*, 207 F.3d 623, 628-29 (9th Cir. 2000), consent is the most important factor in determining what the catch-all provision encompasses, when the matter at issue is a "critical stage" of the proceedings (as opposed to a "subsidiary" one). *Gomez-Lepe* goes on to explain that "where discretion is exercised, the scope of [the] magistrate judge's authority is construed more narrowly." *Id.* at 629. For example, duties that require a "final and independent determination of fact or law" would necessitate consent. *Id.*

---

[11]As the government concedes, § 636 does not explicitly provide for the preparation of a R & R regarding a habeas petition challenging an extradition order. Therefore, the magistrate judge's jurisdiction, if any, must lie in the catch-all provision § 636(b)(3).

**[13]** Here, the magistrate judge's R & R was not a final and independent determination of fact or law, as the district judge reviewed the habeas petition de novo. Thus, the issuance of the report was not a "critical stage" of the proceedings.

**[14]** *United States v. Rivera-Guerrero*, 377 F.3d 1064 (9th Cir. 2004), makes clear that Magistrate Judge Chapman did not exceed her authority in issuing the R & R. In *Rivera-Guerrero*, the district court had erred in delegating to the magistrate judge a final determination regarding involuntary medication.[12] We acknowledged that the issue of involuntary medication is of "clear constitutional importance" and "[a]llowing a magistrate judge to make the ultimate decision in a matter of such clear constitutional import would raise serious Article III concerns." *Id.* at 1070. However, the court found "no statutory or constitutional concerns raised by allowing the magistrate judge to submit proposed findings and recommendations on the involuntary medication determination to the district court for de novo review." *Id.* The court went even further, making a broad statement about delegations to magistrates involving de novo review by the district judge:

> *Raddatz* makes clear that the delegation to magistrate judges of matters that implicate constitutional rights for proposed findings and recommendations is constitutional so long as the findings and recommendations are subject to de novo review by an Article III judge.

*Id.* (citing *United States v. Raddatz*, 447 U.S. 667, 683 (1980)).

**[15]** There is no reason to question the de novo review

---

[12]The *Rivera-Guerrero* court analyzed the issue both as a duty under § 636(b)(1)(B) and § 636(b)(3), *id.* at 1070, so the decision's reasoning applies here.

done by Judge Snyder here. The Order adopting the R & R states that "the Court reviewed the Petition and other papers along with the attached Report and Recommendation . . . as well as petitioner's objections and respondent's response to petitioner's objections, and has made a *de novo* determination." Considering this de novo review, there was no violation of the Federal Magistrates Act or a deprivation of review by an Article III judge.[13]

## CONCLUSION

For all of the foregoing reasons, the extradition of Wang is constitutional, and the issuance of the R & R by Magistrate Judge Chapman comported with the Federal Magistrates Act.

**AFFIRMED.**

---

FERGUSON, Circuit Judge, dissenting:

Not every constitutional question requires judicial scrutiny or resolution. While the judiciary has the power to address questions concerning the content of treaties, *see Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534-35 (1991), the question of whether the President may enter into treaties with non-sovereigns is left to the politically accountable branches of government. The majority announces a flawed and unnecessary constitutional ruling on this issue. Because we should dismiss Wang's appeal for lack of justiciability, I must dissent.

---

[13]Of course, de novo review of a R & R is only required when an objection is made to the R & R, *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) ("Neither the Constitution nor the [Federal Magistrates Act] requires a district judge to review, de novo, findings and recommendations that the parties themselves accept as correct"), as Wang objected in this case.

## I.

The majority rules that whether the President has the constitutional authority to enter into treaties with non-sovereigns, like Hong Kong, is a clear justiciable question under *Baker v. Carr*, 369 U.S. 186, 217 (1962). Instead of "discerning a nation's sovereignty (a political question)," the majority states that we are only "examin[ing] the resulting status of Hong Kong" and "decid[ing] whether the Treaty Clause applies to Hong Kong as a constitutionally cognizable treaty party." Maj. op. at 8650. What constitutes a "constitutionally cognizable treaty party," however, is a question of foreign policy that the judiciary cannot address. In fact, all of the *Baker* factors support dismissing Wang's appeal and leaving resolution of this question to the political process.

## A.

First, mindful of the fact that not "every case or controversy which touches foreign relations lies beyond judicial cognizance," *Baker*, 369 U.S. at 211, the question of whether Hong Kong is a constitutionally cognizable treaty partner is committed to the political branches because it is inextricably linked to the President's broad authority in the field of foreign relations.

The majority narrowly reframes the issue for purposes of the first *Baker* test, as whether the term "treaty" in the Treaty Clause encompasses agreements with non-sovereigns. Maj. op. at 8651. But the real issue here is not as simple as the majority would have us view it. While it is undisputed that the judiciary has the power to interpret the language of the Constitution, including the Treaty Clause, *see Cooper v. Aaron*, 358 U.S. 1, 18 (1958) (per curiam) ("the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since [*Marbury v. Madison*] been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system[ ]"), not

every constitutional question requires judicial interpretation. *See Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."). In its most basic form, the real question before us is whether it is the role of the judiciary or the political branches to decide what constitutes a treaty partner. The Constitution commits the latter to answer this question.

As Chief Executive, U.S. Const. art. II, § 1, cl. 1, and Commander in Chief, U.S. Const. art. II, § 2, cl. 1, the President is "the guiding organ in the conduct of our [nation's] foreign affairs." *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948); *see United States v. Pink*, 315 U.S. 203, 229 (1942) ("[T]he President . . . is the 'sole organ of the federal government in the field of international relations.' ") (citation omitted). In addition to granting the President the power to make treaties with the advice and consent of the Senate, U.S. Const. art. II, § 2, cl. 2, the same clause of the Constitution confers upon the President the sole power to "appoint Ambassadors, other public Ministers, and Consuls," while a subsequent section vests the President with the authority "to receive Ambassadors and other public Ministers." U.S. Const. art. II, § 3. The President's further authority to recognize foreign powers logically derives from his ample constitutional authority in the realm of foreign affairs. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition is exclusively a function of the Executive."); *Pink*, 315 U.S. at 229 ("Objections to the underlying policy as well as objections to recognition are to be addressed to the political department and not to the courts."); *United States v. Sandoval*, 231 U.S. 28, 45-46 (1913) (recognition of Indian tribes is also left to the political branches).

Here, the President, acting within his grant of constitutional authority, engaged in diplomatic relations with Hong Kong

while under British and now Chinese rule. On the basis of this preexisting relationship, the President considered Hong Kong a foreign power—sovereign or non-sovereign—with which the United States could cooperate and reach various agreements, including an extradition agreement. To effectuate his interest in establishing an extradition policy with Hong Kong, the President entered into the Hong Kong Extradition Agreement (HKEA) with the Senate's approval pursuant to the President's constitutionally committed power to "make Treaties, provided two thirds of the Senators present concur." U.S. Const. art. II, § 2, cl. 2. The HKEA is, therefore, a Senate-approved treaty that represents the President's ongoing interest in maintaining foreign relations with Hong Kong.

It is not the role of the courts to question whether the President properly exercised his political power by entering into a treaty with Hong Kong in the process of conducting foreign affairs. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (explaining that "the conduct of foreign relations . . . [is] so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference") (footnote omitted); *United States v. Belmont*, 301 U.S. 324, 328 (1937) (stating that "the conduct of foreign relations was committed by the Constitution to the political departments of the government, and the propriety of what may be done in the exercise of this political power [is] not subject to judicial inquiry or decision") (referring to *Oetjen v. Central Leather Co.*, 246 U.S. 297, 311 (1918)). By virtue of wielding the power to make treaties, appoint ambassadors, and recognize foreign governments, all part of the President's extensive power to conduct foreign relations, the President is necessarily entrusted by the structure of the Constitution with the power to determine who makes a proper treaty partner. *See Alperin v. Vatican Bank*, No. 03-15208, slip op. 6643, 6671 (9th Cir. June 9, 2005) (citing *Nixon v. United States*, 506 U.S. 224, 240-41 (1993) (White, J., concurring)) (" 'The courts . . . are usually left to infer the presence of a political question from the text and structure of the Constitution.' ");

*Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1511 (D.C. Cir. 1984) (en banc) ("The first [*Baker* test] requires the court to determine whether the text of the Constitution implicitly or explicitly commits the stated claim to the political branches.").

Moreover, given the President's broad textual grants of authority in conducting the nation's foreign affairs, the Supreme Court has reasonably invoked the political question doctrine distinctly in the area of foreign affairs. *See Oetjen*, 246 U.S. at 302. In particular, with regard to treaties, the Supreme Court has held that it is a political question whether a treaty survives when one country becomes part of another. *Terlinden v. Ames*, 184 U.S. 270 (1902). A plurality of the Supreme Court has also stated that whether the President may unilaterally terminate a treaty is by its nature a political question. *Goldwater v. Carter*, 444 U.S. 996 (1979). Most applicable here, one of our sister circuits has held specifically that the question of what constitutes a treaty requiring Senate ratification is a political question, *Made in the USA Found. v. United States*, 242 F.3d 1300, 1302 (11th Cir. 2001), *cert. denied*, 534 U.S. 1039 (2001), while another has persuasively explained that the making of international agreements is textually committed to the political branches:

> While the treaty power of the Executive expressly involves the participation of the Legislature, nowhere does the Constitution contemplate the participation by the third, non-political branch, that is the Judiciary, *in any fashion* in the making of international agreements or the recognition of foreign governments. . . . [T]his is one of those areas of foreign relations textually committed to the political branches to the exclusion of the Judiciary.

*Antolok v. United States*, 873 F.2d 369, 381 (D.C. Cir. 1989) (emphasis added).

Although the Constitution does not spell out a pronounced textual limit on the authority granted to the President to make treaties under Article II, it is clear, from both its text and structure, that the Constitution grants the President expansive power in the area of foreign affairs. The power to make treaties, with the advice and consent of the Senate, necessarily implies in the President the power to choose the nation's treaty partners — sovereign or non-sovereign. By intervening in this case, the majority forgets that we must defer to the political branches in political questions even where we think, as the majority does here, that we can provide a basis for sanctioning the President's contested action. *See id.* at 383 (explaining that "it is against that very invasion that the political question doctrine protects the political realm from judicial invasion").

B.

Second, the courts lack judicially manageable standards to determine what constitutes a constitutionally cognizable treaty partner under the Treaty Clause. As in *Goldwater* and *Made in the USA Found.*, the crux of the challenge in the present case is not centered on the treaty's substantive provisions, but rather on what it means to adopt a treaty. In *Goldwater*, for example, the Supreme Court addressed the abrogation of a treaty, a plurality of the Court holding that the question of whether the President could unilaterally terminate a treaty is governed by political standards. 444 U.S. 996. In *Made in the USA Found.*, the Eleventh Circuit addressed the proper procedures for enacting a treaty, concluding that whether the Senate needs to ratify the North American Free Trade Agreement (NAFTA) is a political question. 242 F.3d 1300. Here, we are being asked to address with which foreign governments the President may enter into a treaty. The Constitution is silent with regard to how we address any of these questions.

Such decisions require that we consider areas beyond our judicial expertise. Indeed, in *Made in the USA Found.*, the

Eleventh Circuit held that it lacked the legal tools to decide
what constitutes a treaty requiring Senate ratification in part
because "the Treaty Clause [ ] fails to outline the circum-
stances, if any, under which its procedures must be adhered
to when approving international agreements." 242 F.3d at
1315. Ninth Circuit Judge Betty B. Fletcher, sitting by desig-
nation, cited *Goldwater* distinctly as supporting authority:
there, "the Supreme Court declined to act because the . . .
Treaty Clause fails to outline the Senate's role in the abroga-
tion of treaties." *Made in the USA Found.*, 242 F.3d at 1315.
Here, too, the Treaty Clause fails to outline the foreign gov-
ernments with which the President may properly enter into a
treaty. *See Holmes v. Jennison*, 39 U.S. 540, 569 (1840)
(explaining that "[t]he power to make treaties is given by the
Constitution in general terms, without any description of the
objects intended to be embraced by it"). In other words, there
exists no "identifiable textual limit" in the Constitution on the
President's authority to make treaties with sovereigns or non-
sovereigns. *Made in the USA Found.*, 242 F.3d at 1315.

Not surprisingly, because the Constitution does not speak
to this issue, the majority relies upon a "neutral analysis of the
Indian treaty line of cases," Maj. op. at 8651, to infer that the
President may enter into treaties with non-sovereigns. The
majority's position, like the Second Circuit's position in
*Cheung v. United States*, 213 F.3d 82 (2d Cir. 2000), presup-
poses that Indian tribes were considered non-sovereign at the
time the President entered into treaties with them. *Id.* at 90
(finding that "it is clear that the term 'treaty' had a meaning
broader than an agreement between fully sovereign or inde-
pendent entities"). The Indian treaty line of cases, however,
is not conclusive; in fact, those cases cast serious doubt on
whether the President in the past recognized Indian tribes as
sovereign or non-sovereign.

The majority explains that in *Cherokee Nation v. Georgia*,
for example, the Supreme Court described Indian nations as
"domestic dependent nations," suggesting their non-sovereign

status. 30 U.S. 1, 17 (1831). In the same case, however, the Court underscored the unique relationship between Indian nations and the United States:

> The condition of the Indians in relation to the United States is perhaps unlike that of any other two people in existence. In general, nations not owing a common allegiance are foreign to each other. The term *foreign nation* is, with strict propriety, applicable by either to the other. But the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else. . . . [T]hey are considered as within the jurisdictional limits of the United States, subject to many of those restraints which are imposed upon our own citizens.

*Id.* at 16-17 (1831). In *Worcester v. Georgia*, the Supreme Court elaborated on the issue, describing Indian nations as "distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil," to which the United States has applied "[t]he words 'treaty' and 'nation' " as it has to "other nations of the earth." 31 U.S. 515, 559-60 (1832) (stating that "[t]he constitution . . . adopted and sanctioned the previous treaties with the Indian nations, and consequently admit[ted] their rank among those powers who are capable of making treaties"). Thus, Indian nations may well have been considered sovereign, instead of non-sovereign, when the President entered into treaties with them.

The fact that Congress passed 25 U.S.C. § 71, which prohibited treaties with Indian tribes after 1871, furthers this argument. There, the statute reads, in relevant part:

> *No Indian nation or tribe* within the territory of the United States *shall be acknowledged or recognized as an independent nation*, *tribe, or power with whom the United States may contract by treaty*; but no obli-

gation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired.

25 U.S.C. § 71 (emphases added). Wang contends that this language suggests congressional intent to strip Indian tribes of their sovereign status and affirm the inter-sovereign nature of treaties. Yet the statute could also be read as proof that Indian tribes were never recognized as sovereign nations, but rather as dependent nations.

While it is unclear whether Indian tribes were sovereign or non-sovereign at the time the President entered into treaties with them, what is clear is that Indian nations are historically distinct. To compare United States-Indian treaties to the HKEA, therefore, is neither reasonable nor rational and fails to "fill[ ] in the silence of the Treaty Clause and the extradition statute with respect to the term 'treaty.' " Maj. op. at 8657; *see Alperin*, slip op. at 6677 (explaining that courts must be able "to reach a ruling that is 'principled, rational, and based upon reasoned distinctions' ") (citation omitted). Accordingly, the question of whether the President may enter into treaties with non-sovereigns is not amenable to judicial scrutiny and better left to the political branches to resolve.

## C.

Last, prudential considerations militate against reaching the merits of Wang's appeal. The Supreme Court clearly stated in *Baker* that it is crucial that the nation speaks with one voice in the field of foreign affairs. 369 U.S. at 211 ("[M]any such questions [touching on foreign relations] uniquely demand single-voiced statement [sic] of the Government's views.") (footnote omitted); *see Alperin*, slip op. at 6687 (explaining that it is not the court's place to "make pronouncements on foreign policy"). Here, the majority, while upholding the President's decision to enter into a treaty with a non-sovereign, expresses a lack of respect for the President's han-

dling of foreign relations by questioning the propriety of the President's action. In fact, it provides unwarranted legitimacy to the President's action when such intervention is reasonably avoidable. *See Spector Motor Serv.*, 323 U.S. at 105 (1944) (explaining that "we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable").

The majority contends that this one-voice concern is "overstated" because, even if the court had reached the opposite result, the President would still have the power to enter into an executive agreement or pass legislation with both houses of Congress. Maj. op. at 8652. While I accept that the President may use alternative measures to reach an extradition agreement with Hong Kong, I submit that there is no reason to question the President's decision when both the State Department and the Senate have sanctioned the present action. *Cf. Alperin*, slip op. at 6688 (explaining that the court's involvement in a case in which the State Department has articulated a view on the matter would inevitably show a lack of respect for how the Executive Branch deals with foreign relations); *Made in the USA Found.*, 242 F.3d at 1319 (finding that the Senate's acquiescence in the procedures used to approve NAFTA counseled against judicial intervention in the case); *Goldwater*, 444 U.S. at 996 (Powell, J., concurring) (stating that "[t]he Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse"). Thus, the issue presented is not justiciable.

## II.

The question of whether the President has the constitutional authority to enter into treaties with non-sovereigns, like Hong Kong, is by its nature political and, thereby, non-justiciable. The *Baker* tests inform us, in fact, that the resolution of the issue is inextricably linked to the President's broad authority in the field of foreign relations; that the judiciary lacks the legal tools to resolve the issue in a principled manner; and

that prudential considerations weigh against our involvement in the case. The majority today, as a result, announces an unnecessary constitutional ruling that has the effect of seriously threatening the strength of the political question doctrine. For these reasons, I must dissent.